**Jaswant LAL; Shakuntla Lal; Rikesh Lal Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 98–71087.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1999

Filed July 3, 2001

William Roman Gardner and Miguel D. Gadda, San Francisco, California, for the petitioners.

David W. Ogden, Acting Attorney General, Civil Division; Kristen A. Giuffreda, Senior Litigation Counsel; and John P. Moran, Attorney, Office of Immigration Litigation, for the respondent.

Before: B. FLETCHER*, O'SCANNLAIN, and MICHAEL DALY HAWKINS, Circuit Judges.

Opinion by Judge BETTY B. FLETCHER: Dissent by Judge O'SCANNLAIN

BETTY B. FLETCHER, Circuit Judge:

Jaswant Lal and his family, citizens of Fiji of Indo–Fijian ethnic origin, petition this court for review of a decision of the Board of Immigration Appeals ("BIA"). In May 1994, an Immigration Judge ("IJ") granted asylum to the family, finding persecution based on religion and political opinion. The INS appealed and the BIA reversed, ordering the petitioners deported to Fiji. We grant the timely petition for review, find eligibility for asylum, order withholding of deportation, and remand to the BIA for exercise of discretion as to the grant of asylum.

I.

The BIA's factual determinations are reviewed under the substantial evidence standard. *See INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We owe deference to legal decisions rendered by the BIA under

---

\* Following the death of Judge Wiggins, Judge B. Fletcher was drawn to replace him. She has listened to the tape of argument and read the briefs and the administrative record.

the rubric of *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). *See Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Singh–Bhathal v. INS*, 170 F.3d 943, 945 (9th Cir.1999); *Santamaria–Ames v. INS*, 104 F.3d 1127, 1130 (9th Cir.1996). We may reverse if the evidence is such that a reasonable factfinder would be compelled to conclude that a well-founded fear of persecution has been established. *See Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812; *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998); *Chand*, slip op. at 9392. When, as here, the BIA has conducted an independent review of the record, we review its decision rather than the IJ's. *See Ghaly v. INS*, 58 F.3d 1425, 1430 (9th Cir.1995).

## II.

Jaswant Lal and his family[1] suffered very serious persecution in Fiji on account of Mr. Lal's political opinion and religious beliefs. Their problems began in the late 1980s, when Mr. Lal was a prominent member of the Fijian Labor Party, a legitimate, non-violent organization consisting mostly of Hindu Fijians of Indian descent. Mr. Lal served as branch secretary for a local division of the Labor Party. During the run-up to the 1987 elections, Mr. Lal recruited for the Party, distributed posters, and coordinated events in his region. On election day, he provided transportation services.

The Labor Party was successful in its 1987 electoral bid, winning a majority of seats in Parliament. The Fijian military, which was controlled by members of the native Fijian population, opposed the results and staged a coup in May 1987. The army then set out to terrorize those who had worked to secure the electoral victory of the Labor Party.

In the aftermath of the coup, Mr. Lal was dragged from his home by soldiers, who held guns to his head. He was placed in detention and held for three days by the army. His captors beat and tortured him, explaining that his treatment was in retaliation for his work on behalf of the Labor Party. Mr. Lal was stripped of his clothes, urine was forced into his mouth, and he was cut with knives and singed with burning cigarettes. For three days, he was deprived of food and water. When he asked for something to drink, army officials mocked him by offering meat, which they knew he could not eat because of his Hindu religious beliefs. While Mr. Lal was in jail, Fijian soldiers appeared at the Lal home, stole money and jewelry, and threatened Mrs. Lal and the couple's son.

Sometime after he was released from detention, soldiers returned to the Lals' home and sexually assaulted Mrs. Lal. Mr. Lal was forced to watch the assault at gunpoint. Before they left, the soldiers told the Lals that "people like" them were not welcome in Fiji and would be shot down in the streets. The Lals understood that this comment referred to Fijians of Indian descent.

During the next four years, Mr. Lal was detained again—at least three times—by the government. Each time soldiers forced him from his home at gunpoint. His house was set ablaze twice by the government; extensive damage resulted. The Lal home was placed under constant surveillance. On one occasion, Mr. Lal's Hindu temple was ransacked by soldiers who accused him of holding a political

---

1. The application for asylum is based on Mr. Lal's experience; since the applications of both his wife and child are derivative of his claim, we will focus on Mr. Lal's application in this opinion.

meeting inside the temple. Soldiers forced Mr. Lal to eat meat, told him and his fellow worshippers that they must become Christian, and said they were not welcome in their own country. After burning the temple's sacred text and denigrating Hindu religious figures, the soldiers warned the worshippers that they should leave Fiji or face death. The Lals' son was mocked and taunted, and was denied a place in a well-known school because of his race and religion.

The Lals tried to escape Fiji in 1987, 1988, and 1990, but each time they were turned back at gunpoint at an airport checkpoint because the family had been blacklisted. In 1991, Mr. Lal was detained for the final time. During his 24–hour detention, he was tortured and beaten by soldiers. Searching for a means of escape, the Lals took advantage of an opening: the airport checkpoint that had held the Lals back so many times was gone. With a U.S. visa, Mr. and Mrs. Lal traveled to this country with their son, hoping to escape from their persecutors forever.

### III.

An asylum applicant must demonstrate that he is "unwilling or unable" to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (1994) (defining "refugee"). To establish a well-founded fear of persecution, the applicant must demonstrate that his fear is both objectively reasonable and subjectively genuine. *See Fisher v. INS,* 79 F.3d 955, 960 (9th Cir. 1996) (en banc). Establishing past persecution triggers a rebuttable presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i) (1999). The INS can rebut this presumption by showing by a preponderance of the evidence that conditions "have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.*

In this case, the Immigration Judge found Mr. Lal credible and determined that he had suffered past persecution in Fiji on the basis of his political opinion and religious beliefs. Determining that no record evidence rebutted Mr. Lal's reasonable fear of future persecution, the judge granted asylum. The INS appealed to the BIA. The Board, relying solely on the State Department's *Profile of Asylum Claims and Country Conditions—Fiji* (1994), determined that even though it would not disturb the IJ's finding of statutory eligibility, country conditions in Fiji had changed to such a degree as to render petitioner's fear of future persecution no longer well-founded. The BIA then considered Mr. Lal's case under the humanitarian exception to the changed country conditions rule developed in its own published opinion, *Matter of Chen,* and later codified in regulations relating to asylum. *See Matter of Chen,* 20 I. & N. Dec. 16, 21 (BIA 1989); 8 C.F.R. § 208.13(b)(1)(ii) (1999) ("An application for asylum shall be denied if the applicant establishes past persecution under this paragraph but it is also determined that he or she does not have a well-founded fear of future persecution ... unless it is demonstrated that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country ... arising out of the severity of the past persecution."). The *Matter of Chen* exception is based on a "general humanitarian principle," and it waives the requirement that an individual who has suffered past persecution must also demonstrate a well-founded fear of future persecution. *See id.* at 19. Instead, those who were subjected to severe forms of past persecution need only demonstrate the severity of their past abuse. In this case, the BIA considered the *Matter of*

*Chen* exception, but concluded that Mr. Lal did not show that he suffered from a lasting disability. On this basis, the BIA determined that Mr. Lal's case did not qualify for *Matter of Chen* treatment. The Board therefore reversed the IJ and denied Mr. Lal's application for asylum.

However, the Board's decision is not due the deference that it otherwise would deserve because it interprets the regulation in a manner inconsistent with its plain language and clear intent. We are further convinced that the Board's construction of the humanitarian exception strayed impermissibly from its own case law interpreting the exception, and we reverse on that ground as well. Further, we are bound to hold that Mr. Lal qualifies for asylum under past Ninth Circuit law construing the humanitarian exception. Finally, after careful review of the record in this case, we conclude that the BIA's changed country conditions decision was not supported by substantial evidence and that reversal is called for on this ground as well.

### A. Humanitarian Exception[2]

■ Mr. Lal and members of his family endured repeated arbitrary detentions, painful and humiliating torture, sexual assault, threats, and severe intimidation on the basis of their political opinion and religious beliefs. They suffered the horror of attempting to escape but finding their way barred by government blacklists. Based on the severity of the persecution the Lal family faced in Fiji, the Board was correct to consider this case under the *Matter of Chen* rule.

### 1. BIA's New Requirement of Ongoing Disability

The Board erred, however, in its treatment of Mr. Lal's application under the *Matter of Chen* exception. In its brief consideration of the application, the BIA makes the following statement regarding the humanitarian exception: "there are not compelling reasons for being unwilling to return to Fiji arising out of the severity of the past persecution of the lead respondent. In this regard we observe that the principal respondent does not claim to suffer from lasting physical or emotional disability as a result of past mistreatment." (citations omitted) No other factors are considered by the Board in this regard. It is apparent, therefore, that the Board required that Mr. Lal demonstrate ongoing disability in order to warrant asylum under the *Matter of Chen* exception. Such a requirement is an untenable interpretation of the exception.

---

2. The Government, at oral argument and in its brief, argued that the petitioner had waived the issue of the *Matter of Chen* humanitarian exception. Petitioner's opening brief, however, raised the issue sufficiently when it asked the panel to review whether "substantial evidence is found in the record which would compel an opposite finding than that reached by the Board" and whether "the Board failed to apply the law to the facts of the case and whether it abused its discretionary power." While this presentation of the issues for review is not terribly graceful, it is sufficient, when coupled with this additional paragraph from the brief, to place the Government on notice as to the *Matter of Chen* issue:

> The Board's statement appears to agree that past persecution was proven by the record. Yet the Board panel regarded it as a mild form of persecution, so that, the passage of time mitigated against continued fear. If the Board's view that what the family suffered was only mild persecution, it should re evaluate the factual record. Mr. Lal was jailed, beaten up, held at gunpoint many times, tortured with burning cigarettes. Mrs. Lal was in addition, sexually victimized.

There is no reason—other than to raise the issue of *Matter of Chen* 's humanitarian exception—for petitioner to address the severity of his past persecution in his brief, since the BIA accepted the IJ's finding that Mr. Lal had been persecuted in Fiji.

a. *Deference to the BIA's Interpretation*

■ The *Matter of Chen* exception has been codified by the INS at 8 C.F.R. § 208.13(b)(1)(ii) (1999). We owe agency interpretations of their own regulations substantial deference. *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).[3] When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls "so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (internal citations and quotations omitted).

■ However, we need not defer to the BIA's reading of an INS regulation if an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. 2381 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)); *see also Singh–Bhathal v. INS*, 170 F.3d 943, 945 (9th Cir.1999); *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir.1999).

### (1) *Plain Language*

■ It is difficult to reconcile a requirement of "ongoing disability" with the plain language of the regulation. *Cf. Vincent v.*

*Apfel*, 191 F.3d 1143, 1148 (9th Cir.1999) ("There is no justification for adding limiting language to a clear and unambiguous statute and regulation."). One who has been persecuted and seeks asylum falls within the regulatory exception if they possess "compelling reasons for being unwilling to return to his or her country . . . arising out of the severity of the past persecution." 8 C.F.R. § 208.13(b)(1)(ii). Although we ordinarily owe the BIA some deference to decide what type of past persecution is severe enough, we need not defer if the line they draw is arbitrary or otherwise unreasonable. *Santamaria–Ames v. INS*, 104 F.3d 1127, 1132 n. 7 (9th Cir.1996) ("[D]eference is not afforded if the administrative construction is clearly contrary to the plain and sensible meaning of the regulation."); *Crown Pacific*, 197 F.3d at 1040 ("[I]n examining a regulation, we take into account common sense, the regulatory purpose and the practical consequences of the suggested interpretations."). The ongoing disability requirement is unreasonable because it treats two applicants who are tortured alike differently if one has the good fortune to fully recover from his injuries and the other does not. "Sound regulation should not be founded on shot of accident [or] dart of chance." *Crown Pacific*, 197 F.3d at 1040 (internal quotation marks omitted) (alteration in original). Lal was burned, tortured and cut with knives; his wife and child were harassed and assaulted and his wife was sexually assaulted while he was forced

---

3. Because this case involves the interpretation by the BIA of its own regulation (and not the language of a statute) we look to the line of cases including *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995), *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), and not the line of cases involving interpretations by agencies

of Congressional legislation, including *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See generally* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L.Rev. 612 (1996). Insofar as cases from the latter line are helpful analogs, we will consider them as persuasive authority.

to watch. According to the BIA, this treatment was not severe enough to qualify him for the exception because he does not, for example, have a permanent limp or suffer a loss of hearing. The plain language of the regulation does not allow for this interpretation.[4]

### (2) *Clear Intent*

■ Even aside from the plain language of the regulation, we still need not defer to the BIA's interpretation because it contravenes the clear intent of the agency in creating the rule. In cases involving regulations originally written to codify a rule created by case law, as long as the agency meant to endorse the rule of the particular case without modification, we can refer to that case for insight into the intent and regulatory history behind the rule. Here, *Matter of Chen* is the unquestioned progenitor of the regulation, and it serves as a useful, if not dispositive, guide to determining agency intent. *See* 63 Fed.Reg. 31945, 31947 (June 11, 1998) (calling *Matter of Chen* the case "which the existing regulatory provisions were intended to codify"); *Kumar v. INS*, 204 F.3d 931, 935 (9th Cir.2000) (construing the exception by closely examining the facts of *Matter of Chen*); *Vongsakdy v. INS*, 171 F.3d 1203, 1207 (9th Cir.1999) (same). Statements of

policy in *Matter of Chen* are strong indicators of the intent behind the rule.[5] This case suggests that the exception codified in 8 C.F.R. § 208.13(b)(1)(ii) cannot be read as narrowly as the BIA does here.

Matter of Chen identifies the exception as a general humanitarian principle which applies to a person who has himself or whose family has suffered under atrocious forms of persecution. 20 I. & N. Dec. at 19. In *Matter of Chen*, the BIA recited the horrible persecution that the applicant had suffered in China during the Cultural Revolution as a result of his religious beliefs. The BIA never refers to the fact that Chen suffered permanent injuries as dispositive, and notes that he qualifies for the exception because his family suffered "more than the usual amount of ill-treatment during that turbulent period." *Id.* at 21. *See also Matter of N–M–A–*, Interim Decision 3368, 1998 WL 744095 (BIA 1998); *Matter of H–*, Interim Decision 3276, 1996 WL 291910 (BIA 1996); *Matter of B–*, Interim Decision 3251, 1995 WL 326740 (BIA 1995).

It is clear from reading *Matter of Chen* that the BIA intended to except from the requirement of proving fear of future persecution those applicants who suffered severely under past persecution. These

---

4. The regulation requires proof of one element, "compelling reasons ... arising from the severity of past persecution." 8 C.F.R. § 208.13(b)(1)(iii). The dissent confusingly suggests that this is a list of two elements: compelling reasons and severity. The BIA, the dissent reasons, required proof of an ongoing physical disability to satisfy the compelling reasons "prong." This interpretation is at war with the plain language of the regulation. "Compelling reasons" denote a conclusion drawn by evaluating the severity of past persecution, not an independent requirement. *Matter of N–M–A*, Interim Decision 3368, at 35 1998 WL 744095 (BIA 1998). An applicant's persecution has to be "so severe that the 'compelling reasons' standard has been met." *Id.* This is the way the rule has always

been applied, without exception, until this case. *Id.; Matter of Chen*, 20 I. & N. Dec. at 19; *Matter of H–*, Interim Decision 3276, 1996 WL 291910 (BIA 1996); *Matter of B–*, Interim Decision 3251, 1995 WL 326740 (BIA 1995). The dissent's related suggestion that we failed to "mention[ ] a single compelling reason," infra at 8410, to grant Lal the *Matter of Chen* exception is preposterous given our recitation of the severe persecution that he suffered.

5. In this regard, BIA cases construing *Matter of Chen* can also persuasively suggest regulatory intent. *See, infra,* Part III(A)(1)(a)(3) for a discussion of other BIA cases which support our holding and contradict the BIA's decision in this case.

people are excepted because, as the case explains, "[e]ven though there may have been a change of regime in his country, this may not always produce a complete change . . . in view of his past experiences, in the mind of the refugee." 20 I. & N. Dec. at 19. With this focus, there is no reason to limit the exception to those who suffer permanent disability. The focus is on the suffering that other people caused the applicant in the past, not on whether the medical maladies that arose from that treatment extend over the years.

### (3) *Inconsistent BIA Case Law*

The BIA has, through its adjudications, created a set of "established policies" concerning the meaning of the *Matter of Chen* exception. In *Matter of B-*, Interim Decision 3251, 1995 WL 326740 (BIA 1995), the Board granted asylum to an individual from Afghanistan who had been interrogated, physically abused, detained for thirteen months, and forced to serve in the army on the basis of his assistance to the *mujahidin. Id.* at 9. The Board noted that despite the changes in Afghanistan since the abuse had occurred, the applicant should be granted asylum because "the past persecution suffered by the applicant was so severe" insofar as it involved "physical torture and psychological abuse, inadequate diet and medical care, and the integration of political prisoners with criminal and mentally ill prisoners." *Id.* at 10. Nowhere does the Board find, much less rely on, the existence of an ongoing physical or emotional disability.

In *Matter of H-*, the BIA remanded to the IJ for exercise of discretion when it found that an individual who was detained, beaten, and separated from his family in Somalia on the basis of his clan membership, was eligible for asylum. *Matter of H-*, Interim Decision 3276, 1996 WL 291910 (BIA 1996). In its page-length discussion of the *Matter of Chen* exception, the Board again did not mention—as a

requirement or as a factor—the existence of an ongoing physical or emotional disability. *Id.* at 16–17. Instead, it noted that the IJ should consider "compelling, humanitarian considerations" when determining whether an applicant qualified under the exception. *Id.* at 17. Citing *Chen*, the Board concluded that the rule applies to those applicants who have "suffered such severe persecution that [they] should not be expected to repatriate." *Id.*

Finally, in *Matter of N–M–A–*, the BIA determined that an individual who was detained for one month, beaten, and deprived of food for three days by Afghan authorities because he was suspected of being an anti-communist, had not demonstrated that his past persecution was severe enough to establish eligibility for the humanitarian exception. *Matter of N–M–A–*, Interim Decision 3368, 1998 WL 744095 (BIA 1998). The Board examined Ninth Circuit case law and its own practice, and concluded that "to demonstrate that [an applicant] is eligible for asylum on the basis of his past persecution alone, the applicant must also show that he belongs to the smaller group of persecution victims whose persecution (including the aftermath) is so severe that the 'compelling reasons' standard [of 8 C.F.R. § 208.13(b)(1)(ii) ] has been met." *Id.* at 16–17. While the Board does indicate that it considers the "aftermath" of persecution as part of its evaluation of the severity of the abuse, it also cites to both *Matter of Chen* and *Matter of B-* in support of its construction of the governing regulations. *Id.* at 17. As discussed above, *Matter of B-* did not refer to an ongoing physical or mental disability.

In sum, then, BIA case law demonstrates that while the existence of lasting physical or emotional disability may sometimes be a factor in determining the severity of an applicant's past persecution, it has not been a requirement. This means,

by necessity, that the *Matter of Chen* exception, as interpreted by the Board and now codified in the regulations, does not require the demonstration of an ongoing physical or emotional disability.

By changing its settled practice with respect to this rule, the BIA acted impermissibly and committed an arbitrary and capricious act. 5 U.S.C. § 706(2)(A) (2000). "Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned...." *INS v. Yueh–Shaio Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996). The Supreme Court has further held:

> An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view.

*INS v. Cardoza–Fonseca,* 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). *Cf. Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94–95 (D.C.Cir.1997) (noting, in dictum, that an agency's past interpretations of a regulation are more binding on the agency than its past statutory interpretations because "[o]therwise, the agency could evade its notice and comment obligation by 'modifying' a substantive rule that was promulgated by notice and comment rulemaking").

The BIA has consistently interpreted the *Matter of Chen* exception without requiring ongoing disability. To suddenly change course and add this requirement now is an arbitrary act that is impermissible and, even giving the BIA the deference it is due, should be overturned. *Cf. Dept. of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 339–40, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) (refusing to give *Chevron* deference to the Census Bureau's interpretation of a statute regarding statistical sampling because the Bureau had taken the opposite position on the issue for years).

We accordingly find that the Board's arbitrary use of the physical or emotional disability factor as a requirement in Mr. Lal's case was contrary to its own regulations and case law. Its rejection of Mr. Lal's application was therefore an irrational departure from its policy, which must be overturned. *Cardoza–Fonseca,* 480 U.S. at 447 n. 30, 107 S.Ct. 1207.

### (4) *Ninth Circuit Case Law*

Our holding is supported by our own case law concerning the humanitarian exception. While we owe deference to the Board's interpretation of the immigration laws, we do not "explicitly apply the principles of deference to questions already controlled by circuit precedent, because a panel may not reconsider the correctness of an earlier panel's decisions." *Ladha v. INS,* 215 F.3d 889, 896 (9th Cir.2000).

We have never required that a petitioner demonstrate ongoing disability to qualify for the *Matter of Chen* exception. In *Vongsakdy v. INS,* 171 F.3d 1203, 1206–07 (9th Cir.1999), we found the petitioner eligible for asylum regardless of current country conditions because he had suffered "reeducation," physical and verbal abuse, and deprivation of food in a Laotian camp. Although his persecution was so severe that he did suffer a "permanent impairment," *id.* at 1207, this fact was included in a discussion of the severity of the appli-

cant's abuse, and it was not cited as a requirement. Instead, we held in *Vongsakdy* that the proper approach to the humanitarian exception was to determine whether the petitioner's persecution was roughly comparable to Chen's in *Matter of Chen*, without applying a mechanical "minimum showing of 'atrocity.' " *Vongsakdy*, 171 F.3d at 1207 (quoting and citing *Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir.1995)).

Similarly, in *Lopez–Galarza v. INS*, 99 F.3d 954 (9th Cir.1996), we held that the petitioner was eligible for asylum based on the severity of her past persecution, which included rape and physical abuse at the hands of the Sandinista military. We did not find or comment on any ongoing physical or emotional disability to the petitioner.[6]

Our past case law demonstrates that it is permissible to consider ongoing disability as a factor in applying the humanitarian exception. It is not, however, a *requirement* that such an impairment exist. The BIA's requirement of ongoing disability is unwarranted under the *Matter of Chen* humanitarian rule. For this reason, we reverse.

### (5) *Summary of Deference*

The plain language of the regulation as well as the intent behind the rule cannot be read to include a requirement of ongoing disability.[7] Further, the BIA changed course from its settled policies and ignored Ninth Circuit precedent. Thus, we need not defer to the BIA's attempt to require an ongoing disability in this case. *Thomas Jefferson University*, 512 U.S. at 512, 114 S.Ct. 2381. Accordingly, we hold that the regulatory exception cannot be read as limited to applicants who suffer ongoing disabilities. Because the BIA's interpretation is inconsistent with this holding, it is reversed.

### b. *Aguirre–Aguirre*

We are mindful of the Supreme Court's analysis and holding in *INS v. Aguirre–Aguirre*, 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). We apply the reasoning of that case, but find it to be distinguishable. *See* 526 U.S. at 415, 119 S.Ct. 1439.[8] The Supreme Court reviewed our court's reversal of the BIA's conclusion that an asylum applicant was ineligible for withholding of deportation because he had "committed a serious nonpolitical crime." 121 F.3d 521 (9th Cir.1997). In particular, we held that the BIA failed to consider the

6. We note, however, that as a matter of empirical medical fact, many women who survive sexual assault suffer long-term psychological effects. *Lopez–Galarza*, 99 F.3d at 962–63, nn. 10 & 11. This finding, which was not based on any individual facts regarding Lopez–Galarza, is equally applicable to Mrs. Lal, who endured sexual assault by the Fijian soldiers.

7. Throughout its opinion, the dissent discusses whether an ongoing disability requirement is in harmony with a deferential interpretation of the term "atrocity." However, the words "atrocity" and "atrocious" are never actually used in 8 C.F.R. § 208.13(b)(1)(ii) and used only once in the *Matter of Chen* opinion. Rather, section 208.13 requires the

petitioner to demonstrate "compelling reasons" to fear return based on the "severity" of past treatment. *Matter of Chen* talked about suffering "more than the usual amount of ill-treatment." 20 I. & N. Dec. at 21. Although we and the BIA have sometimes found the *Matter of Chen* exception to apply because of past atrocities, such precedent does not read that term into the regulation, much less make it the appropriate starting point for deferential review.

8. *Aguirre–Aguirre* involves the BIA's interpretation of legislation not regulations. As such, it falls in the *Chevron* line of cases, and is only persuasive authority in this case. *See supra* note 3.

rules embodied in two United Nations documents to which the United States was a party, and which gave rise to the immigration statute in question, as well as a United Nations handbook. 121 F.3d at 524. The Supreme Court held that we "failed to accord the required level of deference" that the BIA was due in interpreting the statute which it administers. *Aguirre–Aguirre*, 526 U.S. at 424, 119 S.Ct. 1439. However, the Supreme Court did not blindly defer to the BIA's interpretation. It carefully examined the statute and decided that the "BIA's approach [was] consistent" with its plain language. *Id.* at 430, 119 S.Ct. 1439; *see also id.* at 426, 119 S.Ct. 1439. We undertake the same analysis in this case and reverse because the BIA's approach is not consistent with the regulation's plain language.

In *Aguirre–Aguirre* we erred and were reversed because we substituted our own interpretation for the BIA's consistent, reasonable interpretation of a statute that was for the BIA to interpret. In this case, we do not replace the BIA's interpretation with our own interpretation. Instead, we follow the approach taken by the Supreme Court and examine whether the BIA's interpretation is contrary to the plain language and intent of the regulation.[9] As we have shown, the BIA's new requirement of ongoing disability is unreasonable and inconsistent with the text of the regulation, the intent of the agency as embodied in *Chen*, and the past practices of the BIA and this Court. We were admonished in *Aguirre–Aguirre* to give deference to the BIA in interpreting immigration laws, but the Court in *Aguirre–Aguirre* acknowledged that while giving deference, we may still identify and reverse decisions of the BIA that are at odds with the text and

spirit of our nation's immigration rules. We are faced with such an inconsistent and unreasonable decision now.

The *Matter of Chen* exception is an expression of humanitarian considerations that sometimes past persecution is so horrific that the march of time and the ebb and flow of political tides cannot efface the fear in the mind of the persecuted. Long-lasting, genuine fear can be visited upon somebody even if they do not have a crippled arm or leg to remind them of what they have suffered, and any other interpretation of the language of the regulation and the intent behind the rule is so clearly inconsistent and unreasonable as to be undeserving of our deference.

### 2. Application of Matter of Chen

 The dissent suggests that the BIA might have weighed Lal's lack of an ongoing disability as a factor, not a requirement, in support of its conclusion to deny asylum under *Matter of Chen. See infra* Part II. This suggestion belies the plain reading of the BIA's decision, which focuses primarily on ongoing disability and does not list other factors as the basis for its reasoning. Furthermore, it would be legal error, under any applicable test, to conclude that the mistreatment suffered by the Lals did not rise to the level of severity required by *Matter of Chen.* The Lal family suffered atrociously. Mr. Lal was dragged from his home under force of arms, detained, beaten and tortured with knives and cigarettes, forced to drink human urine, deprived of food and water, subjected to religious and politically-based taunts and threats, and had his home and place of worship burned. He was forced at gunpoint to undergo the additional hor-

9. Inasmuch as the deferential standard we apply in this case to the BIA's regulatory interpretations can be analogized to the *Aguirre–Aguirre* and *Chevron* line of cases, our consideration of the plain language and intent of the relevant regulatory language is analogous to the *Chevron* step one analysis undertaken in those cases.

ror of watching his wife be subjected to sexual assault. Mrs. Lal, herself, was threatened, harassed, and sexually assaulted. The Lals' child was harassed, mocked, and turned away from school because of his race and religion. Such persecution is comparable to that faced by others to whom we have applied the *Matter of Chen* analysis. *See, e.g., Vongsakdy v. INS,* 171 F.3d 1203 (9th Cir.1999); *Lopez–Galarza v. INS,* 99 F.3d 954 (9th Cir.1996). Thus, even were we to assume that the BIA's decision did not represent a change in policy, its denial of asylum under the humanitarian exception was not supported by substantial evidence.

### B. *Changed Country Conditions*

After rejecting Mr. Lal's claim to asylum based on past persecution, the BIA also rejected the IJ's conclusion that he had demonstrated a well-founded fear of future persecution based on changed country circumstances. The Board found that:

> [T]he evidence of record includes the Department of State's Profile of Asylum Claims and Country Conditions—Fiji (Profile), dated March 15, 1994. This document does not support the principal respondent's contention that he faces a well-founded fear of persecution on account of a statutorily protected ground. The Profile, while acknowledging "racial tensions," confirms that neither the Amnesty International 1992 annual report nor the Department of State's annual country report on Fiji has found evidence of widespread human rights abuse in Fiji. It is noted [in the Profile] that both native Fijians and Indo–Fijians are now leading "tranquil and productive lives" throughout Fiji; and that Indo–Fijians of Moslem, Hindu, Sikh and Christian faiths are economically active and engage in business and professional activities.

BIA Opinion at 2 (citations omitted). This conclusion does not take into account the specific facts on the record that differentiate Mr. Lal's case from those Indo–Fijians who may have been "leading 'tranquil and productive lives' " at the time of the Department's Profile. As we recently explained, the fact that we have upheld similar findings by the BIA concerning changed country conditions in Fiji does not mean that we have adopted "a general proposition that no Indian Fijian can any longer have a reasonable fear of future persecution because conditions in Fiji had improved." *Chand v. INS,* 222 F.3d 1066, 1079 (9th Cir.2000) (discussing and distinguishing *Kumar v. INS,* 204 F.3d 931 (9th Cir.2000)). Instead, "we have long held that the determination of whether or not a particular applicant's fear is rebutted by general country conditions information requires an individualized analysis that focuses on the specific harm suffered and the relationship of the particular information contained in the relevant country reports." *Id.* at 1079.

Applying this rule, we first note that the BIA did not undertake the required individualized analysis. Using such an approach, we find that no reasonable factfinder could conclude that the changed country conditions information in the record is sufficient to rebut the presumption of fear of future persecution that arose once Mr. Lal had demonstrated past persecution. The State Department's 1994 Profile included in the record states generally that there is no evidence of "widespread human rights violations in Fiji." It also states, however, that harassment and intimidation of Indo–Fijians continues, and explains that "[t]he police are sometimes either unable or unwilling to prevent such harassment." Furthermore, the report admits that while the State Department did not observe "a sustained pattern of police violation of basic human rights," the Department had confirmed that official "abuse has occurred." Thus the depart-

ment acknowledges that some Indo–Fijians in Fiji continued to be persecuted as late as 1994. The fact that such abuses may not have been widespread or may not have formed a clear pattern does not mean that particular individuals who have been targeted in the past are safe.[10]

In such a situation, the BIA must ask whether the INS has shown through record evidence that the individual who suffered past persecution is among the general population that is not suffering from a "sustained pattern" of human rights violations, or whether the applicant is among the unlucky few who are most vulnerable to abuse. Such an assessment must take account of the specific attributes of the past persecution on record. *See Chand,* 222 F.3d at 1079. In this case, there is abundant evidence that Mr. Lal was well-known as a leader and organizer for the Labor Party because of his prominent organizing work during the 1987 elections. In addition, we know from the record that Mr. Lal is not among those Indo–Fijians who were attacked at random in the aftermath of the coup. Instead, he was specifically sought at his home by government representatives, taken into detention, and tortured. Members of his family were attacked and harassed. Nor did the abuse cease during Fiji's peaceful periods. Instead, Mr. Lal was sought and detained several times, even though he was no longer working as an organizer. His renown was such that his name was placed on a government blacklist.

Perhaps most importantly, these events spanned a four year period. Like the applicant in *Chand,* then, Mr. Lal "has shown that he has continued to face significant problems in the years after the coup, even after the general conditions improved substantially." *Id.* In short, the record compels a result contrary to that of the BIA, and we must reverse.[11]

Because we reverse the BIA's well-founded fear decision, we must consider whether Mr. Lal has demonstrated eligibility for withholding of deportation. To qualify for this relief, he must "demonstrate that it is more likely than not that [he] would be subject to persecution in the country to which he would be returned." *Id.* (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 423, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (citation omitted)). Because we have found that Mr. Lal would be placed in an extremely vulnerable position were he returned to Fiji, we conclude that Mr. Lal is entitled to withholding of deportation.

## IV.

In conclusion, Mr. Lal is eligible for asylum on the basis of past persecution under the humanitarian exception, and he has a well-founded fear of future persecution. Further, he is entitled to withholding of deportation.

We accordingly GRANT Mr. Lal's petition for review, GRANT withholding of deportation, and REMAND to the BIA

---

**10.** Indeed, it is axiomatic that individuals are often targeted for human rights abuses outside a "sustained pattern" of human rights abuse, and that individuals living in a country where systematic human rights abuses are occurring may not themselves be targeted.

**11.** We have recently held that "all progress made in Fiji toward eliminating racial conflict has been undone" in recent months. *Gafoor v. INS,* 231 F.3d 645, 654 (9th Cir.2000). *Gafoor* held that we can take judicial notice of

the increased unrest in Fiji because the crisis is "so troubling, so well publicized, and so similar to the earlier coups that we would be abdicating our responsibility were we to ignore the situation." *Id.* at 656–57. However, although these recent events have called into question the BIA's analysis of "changed country circumstances," because we have found that Lal is eligible for asylum on independent grounds, we need not remand to the BIA to consider this new evidence.

with instructions to present this matter to the Attorney General for the exercise of his discretion as to asylum under 8 U.S.C. § 1158(b).

O'SCANNLAIN, Circuit Judge, dissenting:

With respect, I cannot join the court's opinion. Regrettably, the court ignores the teaching of the Supreme Court by failing to defer to the BIA's permissible construction of its own asylum regulation. Further, the court simply misconstrues the record in arriving at its conclusion that the BIA's decision to deny asylum is not supported by substantial evidence. Finally, the court misapplies our precedents in rejecting the State Department's opinion, and BIA's reliance on it, that circumstances in Fiji have changed. For these reasons, I must dissent.

## I

Congress has authorized the Attorney General to grant asylum to "refugees." 8 U.S.C. § 1158(b)(1). To be considered a "refugee" and thus be eligible for asylum, an applicant must demonstrate that he is unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant's credible account of past persecution raises a presumption that his fear of future persecution is well-founded. *See* 8 C.F.R. § 208.13(b)(1)(i). The INS can then rebut

this presumption by demonstrating, "by a preponderance of the evidence, that conditions 'have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return.'" *Marcu v. INS*, 147 F.3d 1078, 1081 (9th Cir.1998) (quoting 8 C.F.R. § 208.13(b)(1)(i)). In Lal's case, the BIA found that the INS successfully rebutted the presumption that his fear of future persecution was well-founded by demonstrating that conditions in Fiji have improved significantly since the tumultuous 1987 coup.[1] Unless Lal could benefit from some other applicable rule, the BIA had no choice but to affirm denial of asylum.

### A

But the BIA has developed a humanitarian exception to the general rule. *See Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989). Where he cannot demonstrate a well-founded fear of future persecution (because, for example, country conditions have changed), asylum shall be granted if "it is determined that the applicant has demonstrated compelling reasons for being unwilling to return to his or her country of nationality . . . arising out of the severity of the past persecution." 8 C.F.R. § 208.13(b)(1)(ii). This regulation grows out of *Chen*, which remains the touchstone for determining the applicability of this exception. *See Kumar v. INS*, 204 F.3d 931, 935 (9th Cir.2000); *Vongsakdy v. INS*, 171 F.3d 1203, 1207 (9th Cir.1999). In *Chen*, the BIA explained that where a petitioner has suffered from "atrocious"

---

1. Jaswant Lal applied for asylum claiming that he had been persecuted in Fiji because he was a Hindu Indian who supported the Labour Party. As the Immigration Judge found him credible, I too assume his credibility. *See Singh v. INS*, 94 F.3d 1353, 1356 (9th Cir.1996). The INS challenged Lal's credibility on appeal from the IJ, but the BIA did not decide the issue because it concluded that

even if Lal had established past persecution, changed country conditions supported denial of asylum. On remand, therefore, the INS should have the opportunity to raise the credibility issue. I agree with the BIA and the court that Lal suffered past persecution on account of his race, religion, and political opinion.

persecution, changed country conditions "may not always produce a complete change ..., in view of his past experiences, in the mind of the refugee." 20 I. & N. Dec. at 20.

In Lal's case, the BIA appears to have considered *Chen*'s humanitarian exception[2] and, in concluding that it did *not* apply, stated, "a preponderance of the evidence establishes ... that there are not compelling reasons for being unwilling to return to Fiji arising out of the severity of the past persecution of the lead respondent. In this regard we observe that [Lal] does not claim to suffer from lasting physical or emotional disability as a result of past mistreatment." The majority takes issue with this conclusion, interpreting the latter sentence as requiring that the applicant must demonstrate an on-going disability to qualify for asylum under *Chen*. The majority reverses the BIA's determination because it concludes that a requirement of "lasting ... disability" (sometimes referred to as "ongoing disability") is inconsistent with the plain language and intent of the regulation and because neither *Chen*, nor other BIA cases nor our own cases applying the humanitarian exception require the applicant to establish lasting disability.[3]

With respect, the majority errs because it does not defer to the BIA's permissible construction of its own regulation. In so doing it repeats the error we made in *Aguirre–Aguirre v. INS*, 121 F.3d 521 (9th Cir.1997) ("*Aguirre I* "), *reversed,* 526 U.S. 415, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) ("*Aguirre II* "). "In the course of its analysis, [the Ninth Circuit] fail[s] to accord the required level of deference to the interpretation of the [BIA] ... it should have applied the principles of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)." *Aguirre II,* 526 U.S. at 424, 119 S.Ct. 1439. Although the majority correctly states that substantial deference is owed to the legal decisions of the BIA, it misapplies this broad standard and substitutes its own judgments for that of the agency. The Supreme Court corrected us for making similar errors two years ago in *Aguirre I.* We should not repeat such errors now.

1

The BIA's interpretation of its own regulation is owed "substantial deference." *Thomas Jefferson University v. Shalala,*

2. While I agree with the majority that the petitioner raised this matter on appeal, I cannot endorse its reliance on the following passages in petitioner's brief: whether "substantial evidence is found in the record which would compel an opposite finding than that reached by the Board" and whether "the Board failed to apply the law to the facts of the case and whether it abused its discretionary power." Concluding that a litigant raises a specific issue (even in part) because he makes such broad statements, is like saying that because the petitioner appealed, he raised all issues. This would eviscerate the requirement that a litigant raise the specific issues that he wants us to address. There is a difference between a notice of appeal and a brief. *Compare* Fed. R.App. P. 3 *with* Fed R.App. P. 28. Only because, as the majority

notes, the petitioner asserted that the BIA erred when it underestimated the magnitude of his persecution can I concur that the issue has been raised. The requirement that an issue be raised with particularity is grounded in notions of notice and fairness to the opposing party and should not be lightly set aside.

3. For the sake of discussion here, I assume that the majority is correct that the BIA intended to establish such a requirement. It is equally likely that the BIA's opinion noted the lack of lasting disability as a consideration, not a requirement. In my view, consideration of such a factor would be well within the BIA's authority to give meaning to vague provisions of the statute following the analysis in the remainder of Part I of this dissent.

512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). This broad deference is especially warranted because the BIA's significant expertise makes it well suited to interpret its own regulations in this complex regulatory scheme. *See id; Department of Health & Human Servs. v. Chater,* 163 F.3d 1129 (9th Cir.1998). The BIA's interpretation "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381 (*quoting Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). The Supreme Court has cautioned that we must defer to the agency's interpretation "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* (*quoting Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)).

The majority, however, concludes that a requirement of on-going disability is contrary to both the plain language and the intent of the agency in promulgating the regulation. Yet, it fails to demonstrate how the plain language of the regulation or its intent *compels* an interpretation that does not allow for the imposition of an on-going disability requirement.

### 2

Under BIA's regulations, an applicant is eligible for asylum if he or she "has demonstrated *compelling reasons* for being unwilling to return to his or her country of nationality ... arising out of the severity of the past persecution." 8 C.F.R. § 208.13(b)(1)(ii) (emphasis added). I respectfully disagree with the majority's assertion that demonstrating severe past persecution is sufficient. See supra 1006–07. The BIA has stated: "the applicant must also show that he belongs to the smaller group of persecution victims whose persecution (including the aftermath) is so severe that the 'compelling reasons' standard has been met." *Matter of N–M–A–,* Interim Decision 3368, at 35 1998 WL 744095 (BIA 1998). In *N–M–A–,* the BIA concluded that the applicant did not qualify for the "humanitarian exception" because the applicant had not demonstrated "the severe harm *and* the long-lasting effects of that harm." *Id.* (emphasis added). In other words, the applicant had not shown severe past persecution *and* compelling reasons arising from that persecution. Here, regardless of whether Lal has demonstrated severe past persecution, he has clearly not demonstrated compelling reasons based on this persecution for not being willing to return to his country. The majority erroneously concludes that Lal has satisfied the requirements of 8 C.F.R. § 208.13(b)(1)(ii) without even mentioning a single compelling reason.

Because "compelling reasons" is not defined in regulation or statute, we must give substantial deference to the BIA's interpretation so long as it is not plainly erroneous or inconsistent with the regulation. Even the majority would agree that an on-going physical impairment and an on-going mental impairment caused by the past persecution are compelling reasons for an applicant's unwillingness to return to his country. Certainly, requiring such an on-going impairment to satisfy the compelling reasons standard is not contrary to the plain language of the regulation. Absent an express definition, the BIA's interpretation to restrict "compelling reasons" to on-going impairments is reasonable and is thus owed substantial deference. *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381 (Court must defer to agency's interpretation unless alternative interpretation compelled by plain language or intent). At the very least, the plain language does not foreclose such a requirement. An alternative reading is not, therefore, *compelled* by

the plain language and the majority erred in so holding.

### 3

Nor does the intent of the regulation compel an alternative interpretation rejecting the requirement of on-going disability. As the majority notes, *Chen* is the case the regulation was intended to codify and is a useful guide to determining agency intent. See supra 1005. In no way does *Chen* foreclose the INS's requiring on-going disability. Indeed, that case specifically declines "to delineate the circumstances under which past persecution may or may not be the basis for a successful asylum claim." 20 I. & N. Dec. 16, 22 (BIA 1989).

Moreover, *Chen* actually supports a requirement of an on-going disability. There, the BIA focused not only on the past persecution but also on how such persecution currently affected Chen. The BIA made careful note that Chen was "physically debilitated, must wear a hearing aid . . ., is always anxious and fearful, and is often suicidal." *Id.* at 20. The Board also noted that Chen had vowed suicide if he were forced to return to China. *See id.* These findings by the Board demonstrate that Chen was both physically and emotionally disabled. In explaining the rationale behind the exception, the Board highlights the importance of examining the connection between the past persecution and the present day: "It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee." *Id.* at 18–19. The board's reference to the applicant's present mind-set in light of the past persecution appears to speak directly to whether the applicant is "emotionally disabled." The intent of the agency in promulgating the regulation, as amplified by *Chen,* supports a requirement that the applicant demonstrate an emotional or physical ailment that makes him unwilling to return to his country.[4]

### B

The majority attacks the BIA's interpretation of its own humanitarian rule on several fronts, each of which fails to survive careful scrutiny.

### 1

The majority states repeatedly that a requirement of on-going disability is unreasonable "because it treats two applicants who are tortured alike differently if one has the good fortune to fully recover from his injuries and the other does not." Supra at 1004. But such observation highlights the majority's fundamental miscomprehension of the humanitarian exception. Based solely on the fact of their past torture, the two hypothetical applicants have only demonstrated that they have suffered past persecution. Nevertheless, the regulation requires that the applicant *also* demonstrate *compelling reasons* arising out of the past persecution for not being willing to return to his country.

Treating two similarly tortured applicants differently is amply supported by the policies of this regulation and of asylum generally. Virtually all victims of persecution carry with them the memories of their

---

4. Of course, under our substantial deference standard of review, the intent of the regulation need not "support" a requirement of ongoing disability, the agency's choice will prevail unless an alternative interpretation is compelled. *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381.

persecution. Our asylum law, however, seeks only to help those who cannot, by repatriation, get a fresh start in their country, whether it be from an objective fear of future persecution or for compelling reasons based on severe past persecution. "Asylum is a prophylactic protection . . . [and] is designed not to remedy the past." *N–M–A–*, Interim Decision 3368, at 29 (*citing Marquez v. INS*, 105 F.3d 374 (7th Cir.1997)) (internal citations omitted). The regulation is aimed at helping those who, like Mr. Chen, suffer from the long-lasting effects of persecution to the extent of being physically debilitated, always anxious and fearful, and suicidal at the prospect of returning to the country of his persecution. *Chen*, 20 I. & N. Dec. 16, 20.

The majority would restrict the application of the regulation to treating all similarly tortured applicants alike regardless of changed conditions. But this oversteps the judicial role. While the BIA may, in the exercise of its discretion, interpret the regulation in such manner it is simply not compelled to do so either by the plain language or intent. Based on the majority's confined interpretation of the regulation, two applicants who have suffered identical past persecution would be treated the same regardless of whether one applicant has no memory nor physical reminder of his past persecution. To such applicant, asylum would only be a remedy for a past persecution he does not even remember; it would serve no prophylactic function in having the applicant avoid repatriation to relive the horrors of his memories amidst his persecutors and the surroundings of his persecution. Yes, the applicant who has had the good fortune of recovering from his physical and emotional wounds has no right, under the regulation, to asylum from a country in which the conditions which wrought the persecution no longer exist.

2

The majority further contends that the BIA's interpretation is owed less deference because it is arbitrary and capricious and represents an irrational departure from a settled course of adjudication. See Supra at 1006-07. The BIA's application of the *Chen* exception, however, demonstrates that a requirement of an on-going disability is a logical extension of a consistent policy. Indeed, virtually all decisions applying the *Chen* exception have discussed the presence or absence of the long-term effects of the past persecution.

In *Chen* itself, the BIA carefully detailed emotional and physical scars from his past persecution in granting him asylum. Without expressly referring to "lasting . . . disability," *Chen* specifically declined to prescribe the requirements for asylum under this exception. *Chen*, 20 I. & N. Dec. 16, 22. Applying such a disability requirement here is fully consistent with *Chen*.

In *N–M–A–*, the BIA noted that to meet the "compelling reasons" standard of the regulation the focus is appropriately on the "aftermath" of the persecution and "the long-lasting effects of [the] harm." *N–M–A*, Interim Decision 3368, at 35. In finding that he did not qualify for asylum, the board noted that the applicant had not testified to any "long-lasting effects" from the persecution and that there was a lack of "evidence of severe psychological trauma stemming from the harm." *Id.*

In *Matter of H-*, where the Board granted asylum to the applicant based on the *Chen* exception, the Board noted that the applicant had been "badly beaten on his head, back, and forearm with a rifle butt and a bayonet, resulting in scars to his body which remain to the present." *Matter of H-*, Interim Decision 3276, at 14 1996 WL 291910 (BIA 1996). The Board clearly found that the applicant had an on-going physical disability. Requiring such a dis-

ability there was not an irrational departure from *Chen.*

*Matter of B-,* contrary to the majority's assertion, is not inconsistent with a requirement of on-going disability. While the Board did not make a specific finding of on-going physical or emotional disability, the Board did note that the applicant had suffered "electric shocks" and thirteen months in detention and prison receiving "various forms of physical torture and psychological abuse." *Matter of B-,* Interim Decision 3251, at 2, 6 1995 WL 326740 (BIA 1995). It is highly probable that the applicant suffered permanent physical and emotional scars from this atrocious persecution. A person who suffers electric shocks will likely be permanently scarred. Equally probable is that a person who receives 13 months of various forms of psychological abuse will be emotionally scarred. Where it is likely that B had either emotional or physical scarring, a requirement of such a disability cannot be said to be inconsistent with this decision. Even if B did not suffer from an on-going disability, *one* BIA decision granting asylum without requiring such a disability would not render the general requirement an irrational departure from BIA policy.

A requirement of on-going disability is clearly consistent with the BIA's past application of the *Chen* exception. In *N–M–A–,* the Board made an explicit finding that the applicant had not testified to the long-lasting effects of the persecution. In *Chen* and *B-,* the Board specifically noted the physical scars of the applicants. In *H-,* it is highly likely that the applicant suffered both physical and emotional disabilities from his electric shock torture and the many months of psychological abuse. To require an explicit on-going disability now is not contrary to these previous BIA decisions that relied heavily on the presence and absence of such a disability.

At worst, the "lasting ... disability" requirement is a narrow view of what constitutes compelling reasons. In *INS. v. Yueh–Shaio Yang,* 519 U.S. 26, 32, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996), the Supreme Court reasoned that since "entry fraud" was "a rule of the INS's own invention, the INS is entitled, within reason, to define that exception as it pleases." *Id.* Similarly, a narrow view of "compelling reasons" is not a disregard of the BIA's general policy of considering the long-lasting effects of the persecution. After all, the *Chen* exception is a regulation created by the BIA, and, as such, it is entitled to define it as it pleases.

3

Sadly, the majority repeats the errors of *Aguirre I,* which was reversed by *Aguirre II,* in which the Supreme Court admonished this court for having failed to accord the BIA's interpretations the deference they are owed and for simply imposing our own construction of the statute.

*Aguirre II* involved the definition of a "serious nonpolitical crime," a provision of asylum law that prevents an applicant, otherwise eligible for withholding of deportation, from remaining in the United States because of crimes committed in his country of origin. *See* 526 U.S. at 419, 119 S.Ct. 1439; 8 U.S.C. § 1253(h)(2)(C). Applying the definition of a "serious nonpolitical crime" adopted in one of its earlier decisions, the BIA had concluded that the applicant committed serious nonpolitical crimes. *See Aguirre II,* 526 U.S. at 422–23, 119 S.Ct. 1439. We reversed, concluding that the BIA had incorrectly interpreted the provision. *See Aguirre I,* 121 F.3d at 524. We held that the BIA had erred because it failed to consider the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ("UN Hand-

book") and did not heed our precedent when it applied the serious nonpolitical crime provision. *See id.* We held that following the UN Handbook and our cases, the BIA should have considered the persecution the petitioner might suffer if he returned, whether his crimes were grossly disproportionate to their alleged objectives, and whether his actions were "atrocious" as defined by our cases. *See id.* Judge Kleinfeld dissented. *See id.* at 524–25. In turn, the Supreme Court reversed and held that we had not appropriately deferred to the BIA as the agency charged with administering the statute. *See Aguirre II,* 526 U.S. at 425, 119 S.Ct. 1439. In analyzing the present case, the majority fails to follow the principles and path laid out in *Aguirre II.*

In Lal's case, the BIA interpreted its own decision (*Chen*) as codified in the regulations (8 C.F.R. § 208.13(b)(1)(ii)). Such an interpretation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Thus, the issue before us, of course, is whether the BIA's requirement that an applicant show "lasting ... disability" in order to avoid the well-founded fear of future persecution element of asylum eligibility is a "permissible construction" of the regulation. *Id.* The question becomes whether an alternative interpretation is *compelled* by the plain language of the regulation or the intent in promulgating it. *Thomas Jefferson,* 512 U.S. at 512, 114 S.Ct. 2381. In rejecting the BIA's decision, the majority never states how the plain language or intent of the regulation compels an alternative interpretation that disallows a requirement of on-going disability.

Applying the lessons of *Aguirre II* here, the majority's interpretation of the *Chen* exception, "is not obvious" "[a]s a matter of plain language." *Aguirre II,* 526 U.S.

at 426, 119 S.Ct. 1439. Nowhere in the regulation is the meaning or scope of "compelling reasons" defined. It is not at all obvious that "compelling reasons" should be based on anything more than physical and emotional disabilities. Although the majority's interpretation may well be reasonable, the BIA is not compelled to follow it. Because of the BIA's expertise, we defer to it to choose among all of the competing reasonable interpretations the one interpretation which it believes best comports with its policy goals. By not deferring to the BIA and, instead, substituting its own judgment, the majority has repeated our errors from *Aguirre I.*

4

Finally, the majority faults the BIA for failing to follow our previous cases applying the *Chen* exception, in particular *Vongsakdy* and *Lopez–Galarza.* None of our cases forecloses the requirement that a petitioner claim an on-going disability in order to qualify for asylum under *Chen,* and the facts of those cases indicate that the existence of a continuing disability is an important consideration. In *Vongsakdy,* we compared the persecution suffered by the petitioner to that suffered by Chen. We noted specifically that "[b]oth suffered serious physical injuries and were denied medical care, *resulting in permanent impairment.*" 171 F.3d at 1207 (emphasis added). In *Lopez–Galarza,* where the petitioner was raped, abused, deprived of food and imprisoned, there is no indication of whether she suffered an on-going disability. But we did not hold in that case that the persecution satisfied the requirements of humanitarian asylum; instead, we remanded the case to the BIA so that it could consider the possibility. *See* 99 F.3d at 963. Thus the best that can be said for the majority's position is that none of our cases explicitly state that on-going disability is a requirement. But the BIA's impo-

sition of such a requirement certainly does not contradict our case law.[5] According to the majority's analysis, an agency is foreclosed from altering its interpretation of a statute or regulation unless that interpretation has been specifically acknowledged and approved by our case law. This standard does not accord the deference embodied in *Chevron* that is necessary for an agency to "give[ ] ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'" *Aguirre II*, 526 U.S. at 425, 119 S.Ct. 1439 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 448–49, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

## C

Neither the humanitarian exception, nor the majority's reinterpretation of it, can overcome the deference *Aguirre II* requires us to give to the BIA in the disposition of its regulations. For the foregoing reasons, the BIA's decision to deny Lal asylum is based on a permissible construction of the asylum statute, is consistent with *Chen* and our cases, and should be upheld.

## II

Notwithstanding the discussion in Part I, it is entirely possible that the majority has over-interpreted the BIA's decision; that is, the BIA may never have intended to establish a new "lasting ... disability" requirement as a matter of law. After laying out the facts of Lal's persecution, the BIA concluded:

> a preponderance of the evidence establishes ... that there are not compelling reasons for being unwilling to return to Fiji arising out of the severity of the past persecution of the lead respondent. In this regard we observe that the prin-

cipal respondent does not claim to suffer from lasting physical or emotional disability as a result of past mistreatment. Rather than establishing a new legal requirement, the BIA may have been simply supporting its conclusion that the totality of the facts of this case does not support asylum under *Chen* by noting that Lal did not claim ongoing disability. If this interpretation of the BIA's opinion is correct then, the majority should have reviewed the BIA's decision under the substantial evidence standard. *See INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Kumar*, 204 F.3d at 934–35 (applying the substantial evidence standard to our review of the BIA's decision that the petitioner did not qualify for asylum under *Chen*). On the facts of this case, the BIA's decision that the severity of the persecution suffered did not rise to the level of "atrocity" is clearly supported by substantial evidence and the majority errs in concluding otherwise.

We have held that in considering the humanitarian exception, the BIA should compare the severity of the persecution endured by the applicant with that suffered by the petitioner in *Chen*. *See Lopez–Galarza*, 99 F.3d at 963. As the majority recognizes, the BIA here did just that. After describing extensively the persecution that Lal suffered, the BIA's conclusion, citing *Chen*, was sufficient and does not lack substantial evidence to support it. *See Marcu*, 147 F.3d at 1082–83. In *Marcu*, we stated:

> With regard to [the claim for humanitarian asylum], the BIA held: "[B]ased on the evidence on hand, we do not find sufficient humanitarian grounds to grant the respondent asylum as a matter of discretion. The actions were not so se-

---

**5.** The BIA does not contradict its own case law either as the petitioner in *Chen* suffered permanent impairment.

vere or atrocious in nature to warrant asylum for humanitarian reasons." Although we require more than a mere comment from the BIA, all that is necessary is a decision that sets out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered and decided. *Id.* at 1082. As in Lal's case, in *Marcu,* "[t]he BIA set forth in its opinion an extensive description of the harassment and abuse [the petitioner] endured.... In the BIA's judgment, however, that harassment and abuse did not rise to the necessary level of severity or atrociousness to warrant asylum on humanitarian grounds. The BIA's opinion demonstrates that it heard the claim, considered the evidence, and decided against [the petitioner]." *Id.* at 1083. That is precisely what occurred here. As we concluded in *Marcu,* "No more was required." *Id.See also Kazlauskas,* 46 F.3d at 906–07 (holding that the IJ did not abuse his discretion where he considered the severity of the petitioner's and his family's persecution, the likelihood of future persecution, the circumstances surrounding the petitioner's departure and entry into the United States).

The two cases cited by the majority—*Lopez-Galarza* and *Vongsakdy*—do not teach otherwise. In *Lopez–Galaraza,* the BIA erred because it "simply failed to consider the level of atrocity of past persecution." 99 F.3d at 963. In that case, the BIA did not "provide an explanation sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided." *Id.* (quotations omitted). Here, the BIA made it clear that it had considered the severity of the past persecution, but did not consider it to rise to the level of "atrocity." It fulfilled all the requirements of *Marcu.*

In *Vongsakdy,* the petitioner suffered permanent impairment resulting from his two-year ordeal at a forced labor camp. There, he was deprived of food and water, beaten and tortured, had his fingers broken, denied medical care, compelled to witness the killing of his friend, and had his thumb severed by a rifle blow. *See* 171 F.3d at 1205–06. Lal's experience, though brutal, was simply not as serious. Lal was beaten and tortured and deprived of adequate food and water for three days, not two years. His home and temple were robbed. He was forced to watch as soldiers fondled his wife. He was detained an additional three times. He was prevented from leaving the country. One should not minimize in any way the severity of the brutality suffered by the Lal family, but the standard, as established by *Chen* and our own cases is one of "atrociousness." This standard must be kept high to prevent the exception from destroying the carefully calibrated statutory and regulatory scheme.

Let us remember, our standard of review is substantial evidence; that is, the evidence in the record must compel the opposite conclusion reached by the BIA before we are at liberty to overturn its judgment. *See Vongsakdy,* 171 F.3d at 1206. Given the definition of "atrocity" endorsed by the Supreme Court, the appropriate standard of review, and the need to take care that the exception does not swallow the rule, I cannot say that the BIA's conclusion that the persecution was not serious enough is not supported by substantial evidence.

Finally, the majority's conclusion cannot be reconciled with our recent decision in *Kumar.* In that case, the petitioner, like Lal, a Fijian of Indian descent and supporter of the Labour Party, suffered from extensive persecution. The soldiers entered the Kumar's home, beat and tied up Kumar's parents and then forced them to watch as they stripped Kumar of her clothes and sexually assaulted her. *See*

204 F.3d at 932–33. The soldiers threatened Kumar's life and took her father into custody where they beat him for two weeks. *See id.* Later that same year, soldiers destroyed the temple where Kumar was worshiping, dragged her out by her hair and punched and kicked her until she agreed to convert from Hinduism. *See id.* at 933. They also knocked her mother unconscious when she tried to intervene. Still later, a group of soldiers caught up with Kumar while she was at school and beat her until she was unconscious. *See id.* Despite the ferocity of the persecution Kumar suffered, we held that the record did not compel us to conclude that the BIA erred when it decided that the severity of the persecution did not rise to the level required for humanitarian asylum. *See id.* at 935.

The majority does not even attempt to reconcile these cases, and I believe it cannot. On the facts, Kumar and Lal suffered from very similar experiences of persecution. I find it improbable that the facts of Lal could compel us to conclude that no reasonable person could fail to find that the severity of Lal's persecution rose to the level of "atrocity" required for humanitarian asylum, while those of Kumar do not.

Substantial evidence supports the BIA's conclusion that Lal is not eligible for asylum because he failed to demonstrate compelling reasons arising out of severe past persecution for not being willing to return to his country. If the BIA did require a showing of permanent impairment before granting asylum based on the "compelling

reasons" standard of 8 C.F.R. § 208.13(b)(1)(ii), we should defer to its decision as a permissible construction of its regulation.

### III

In light of the discussion in Parts I and II, one must reach the question whether substantial evidence also supports the BIA's conclusion that changed country conditions have obviated Lal's well-founded fear of future persecution.

### A

The BIA found by a preponderance of the evidence that since the 1987 coup, "country conditions in Fiji have changed to such an extent that [Lal] no longer has a well-founded fear of being persecuted. . . ." The BIA noted that the State Department report, issued in 1994, stated that there was no evidence of widespread human rights violations in Fiji against ethnic Indians and that Indo–Fijians engage in business and professional activities. It noted that both ethnic Fijians and ethnic Indians lead " 'tranquil and productive lives' throughout Fiji." [6] Thus the BIA ordered the Lals deported if they did not depart voluntarily within 30 days.

We review the BIA's conclusion regarding changed country conditions for substantial evidence. *See Marcu,* 147 F.3d at 1081. Lal's past persecution establishes a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i). The INS then rebutted

---

6. OUR REVIEW IS LIMITED TO THE EVIDENCE CONTAINED IN THE ADMINISTRATIVE RECORD. NEVERTHELESS, I CANNOT TURN A BLIND EYE TO THE RECENT REPORTS OF RENEWED CONFLICT IN FIJI BETWEEN THE INDIGENOUS FIJIANS AND ETHNIC INDIANS. *See, e.g.,* SAM HOWE VERHOVEK, "BURST OF ETHNIC TENSION IN FIJI THREATENS SOUTH SEAS 'EDEN,' " N.Y. TIMES, June 7, 2000, at A1. The hostage crisis comes after a period of tranquility during which an ethnic Indian was elected prime minister. In any case, the proper avenue to address any pertinent changes in the country subsequent to the BIA's decision is to file a motion to reopen the proceedings with the BIA. *See* 8 C.F.R. § 3.2.

this presumption by demonstrating, "by a preponderance of the evidence, that conditions have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Marcu,* 147 F.3d at 1081 (quotations omitted). The State Department country reports are "the most appropriate and perhaps the best resource for information on political situations in foreign nations." *Kazlauskas,* 46 F.3d at 906 (quotations omitted).

The events which Lal alleges took place primarily from 1987 to 1988, the year following the coups, with one isolated incident in 1991. Despite Lal's credible accounts of severe past persecution, the Report provides substantial support for the BIA's conclusion that the situation in Fiji has changed so significantly that Lal may return without fear of future persecution. *cf. Marcu,* 147 F.3d at 1081–83. In *Marcu,* an applicant who had been persecuted for more than twenty-five years in Romania on account of his pro-American views was denied asylum because of the changes that occurred in that country after the fall of the Ceausescu regime. This was so despite the fact that Marcu had been beaten in the year following the change in leadership. *See Marcu,* 147 F.3d at 1081. As in *Marcu,* almost all of the incidents Lal alleges here occurred in that "chaotic" first year following the coup. Unlike the petitioner in *Marcu,* here Lal suffered one additional instance of persecution after that time in 1991. Mindful of the Supreme Court's admonishment that we are not to overturn the decision of the BIA unless the evidence *"compels"* us to do so, we cannot say that this one later event compels us to conclude "that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Za-*

*carias,* 502 U.S. at 483–84, 112 S.Ct. 812 (emphasis added).

Despite the targeted and protracted nature of the persecution Lal suffered, the record provides substantial evidence to support the BIA's conclusion. Lal was persecuted on account of his political views, his ethnicity and his religion. The 1994 country report indicates that the previous two elections (both taking place after Lal's last instance of persecution) were fair and free; the Indo–Fijian parties participated without interference on the part of the government. In the 1992 elections four of the twelve parties were Indo–Fijian. Although prevented by the Constitution from gaining control of the government, the record shows that the non-ethnic Fijian parties controlled 33 (in contrast to the ethnic Fijians' 37) of the seats in the lower house of Parliament. Thus the Report provides substantial support for the BIA's conclusion that if Lal were to return, he would not face persecution on account of his political participation.

With respect to the persecution Lal suffered on account of his ethnicity and religion, the State Department report concludes that Fijians of all faiths and ethnicities lead tranquil and active business and personal lives. The Indian community dominates the business and the professions, and is well-represented in public service. It is true that the report and several newspaper articles in the record indicate some continued ethnic tension, and that the police are at times slow to prevent harassment of Indo–Fijians. The report concludes, however, that overall Fijians of both ethnicities "are leading tranquil and productive lives throughout Fiji," and there is no widespread violation of human rights against Indo–Fijians on the part of the military or the police.[7]

---

**7.** Lal suffered his last instance of persecution in 1991. The State Department Report states that widespread persecution of ethnic Indians had ended by 1994.

As the court held in *Marcu*, we need not resolve the factual dispute over the current conditions in Fiji. *See id.* at 1082. "Our task is to determine whether there is substantial evidence to support the BIA's finding, not to substitute an analysis of which side in the factual dispute we find more persuasive." *Id.* Our case law well establishes "that the country report from our Department of State is the 'most appropriate' and 'perhaps best resource,'" for determining country conditions. *Id.; Kazlauskas*, 46 F.3d at 906. As such, the State Department report "provide[s] substantial evidence for the BIA's determination that the INS successfully rebutted the presumption of future prosecution." *Marcu*, 147 F.3d at 1082.[8] The record simply does not compel a reasonable factfinder to reach the opposite conclusion.

### B

Lal and the majority assert that the State Department reports are insufficiently individualized to be helpful is assessing the reasonableness of Lal's fear of future persecution. As noted above, however, the State Department reports are the best source of information regarding country conditions, and we have held that the BIA may rely on them to determine whether an applicant has a well-founded fear of future persecution. *See, e.g., Kazlauskus*, 46 F.3d at 906.

Nor is the BIA's conclusion that Lal need no longer fear persecution based on an insufficiently individualized assessment of the Report as it applies to his case. *See Garrovillas v. INS*, 156 F.3d 1010 (9th

Cir.1998). In *Garrovillas*, this court held the BIA's analysis of changed country conditions to be insufficiently specific. But the context of that determination differed significantly from the case at hand. In *Garrovillas*, the BIA had found that the petitioner did not establish past persecution and it did not afford him the presumption of well-founded fear of future persecution. *See id.* at 1017. Nor did it analyze the facts to assess whether the presumption had been rebutted by the changed country conditions. All the BIA did was quote two paragraphs of the State Department report without mentioning its applicability to the case. *See id.* "Thus it [was] not clear whether this quotation was intended to serve as a means of rebutting the presumption of a well-founded fear of future persecution." *Id.*

In contrast, the BIA here afforded Lal the presumption of a well-founded fear of future persecution, and then found that the country report "establishes that since that persecution occurred, country conditions in Fiji have changed to such an extent that the lead respondent no longer has a well-founded fear of being persecuted...." Lal claims persecution on account of political opinion, religion, and ethnic origin; the portions of the report cited by the BIA referred specifically to the decreased political and ethnic tension between ethnic Fijians and Indians and the "tranquil and productive lives" of Fijians of all faiths. Unlike in *Garrovillas*, the BIA here made it clear that it considered the appropriate presumption, found it rebutted, and dis-

---

**8.** Petitioner cannot distinguish *Marcu* by arguing that the BIA's finding there found support in both the State Department report and a letter from the Director of the Office of Asylum Affairs individualized to the petitioner's case. *See* infra at 8423–24. It does not follow that absent the Director's letter, the BIA's finding would have lacked substantial

support. In any case, *Kazlauskas* firmly establishes the proposition that a State Department report can be enough by itself. In *Kazlauskas*, we affirmed the BIA's changed country condition finding based *only* on the State Department report. *See id.* 46 F.3d at 906.

cussed those sections of the report that dealt specifically with the reasons for which Lal was persecuted. In sum, the requirement that the changed country conditions analysis be individualized to the petitioner is met in this case.[9]

### IV

The majority rejects a reasonable interpretation by the BIA of its own regulation and misinterprets it as adding a new requirement. It then compounds its error by failing to apply the correct standard of review. Finally it misconstrues the law on "changed country conditions." In my view, the BIA's construction of the statute is a permissible one. As sympathetic as the Lals' application is, nothing in the record legally compels a result different from that reached by the BIA.

Accordingly, Lal's petition for review of the BIA decision should be denied and, I, therefore, respectfully dissent.

---

9. The petitioner appears to mistake the requirement that the IJ and BIA undertake an individualized analysis of how the changed country conditions affect the particular petitioner's case with a requirement that the State Department report provide individualized analysis. The State Department issues reports describing the political situation in the country. The IJ and the BIA then analyze the reports to determine whether the information contained therein is relevant to the individual asylum seeker's application. Requiring more of the State Department when thousands of asylum applications are filed each year would be unfounded in law, regulation or precedent. In any case, we have explicitly rejected the notion that the Report itself must be individualized. *See Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir.1995).