**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARLOS ANTONIO LEZAMA-GARCIA,
                    *Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,
                    *Respondent.*

No. 06-74703

Agency No.
A75-479-222

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted November 5, 2010*
Pasadena, California

Filed November 30, 2011

Before: Alfred T. Goodwin and Johnnie B. Rawlinson,
Circuit Judges, and J. Michael Seabright,** District Judge.

Opinion by Judge Seabright;
Dissent by Judge Rawlinson

---

*The panel unanimously concludes that this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable J. Michael Seabright, United States District Judge for
the District of Hawaii, sitting by designation.

20457

## COUNSEL

Raul Montes, Montes, Montes & Montes, Chula Vista, California, for petitioner Carlos Antonio Lezama-Garcia.

Scott Rempell, United States Department of Justice, Washington D.C., for respondent Attorney General Eric H. Holder Jr.

## OPINION

SEABRIGHT, District Judge:

Carlos Antonio Lezama-Garcia ("Lezama"), a native and citizen of Nicaragua, petitions for review of an order of the Board of Immigration Appeals ("BIA") dismissing his appeal of an immigration judge's ("IJ") order of removal. The IJ determined that, under 8 C.F.R. § 245.13(k)(1), Lezama had

abandoned his pending application for adjustment of status under Section 202 of the Nicaraguan Adjustment and Central American Relief Act[1] ("NACARA") as of the moment he drove from the United States into Mexico — even if his unplanned departure was not desired and he immediately turned around and attempted to return. As a result, the IJ ordered Lezama to be removed as an inadmissible arriving alien.

We conclude that deeming Lezama's NACARA application abandoned was contrary to the regulation, and ordering removal conflicted with NACARA itself. We therefore grant the petition and remand for further proceedings.[2]

## I.  BACKGROUND

Lezama entered the United States without inspection from Nicaragua. He has remained in this country continuously since at least April 1993 (other than the March 2004 incident in question here where he drove into Mexico).[3] He was subject to an order of removal, having had a prior asylum application denied *in absentia* in 1997. In March of 2000,[4]

---

[1]Pub. L. No. 105-100, 111 Stat. 2160 (Nov. 19, 1997) (codified as amended in statutory notes following 8 U.S.C. § 1255).

[2]The BIA also affirmed the IJ's denial of Lezama's applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We uphold those aspects of the BIA's decision in a separate memorandum disposition filed concurrently with this opinion.

[3]Several documents in the administrative record indicate that Lezama entered in March or April 1993, although an earlier asylum application suggests that he first entered in April 1991. In any event, the record is undisputed that he was present in the United States continuously from April 1993 until March 25, 2004.

[4]The exact date of his NACARA § 202 application is unclear — a U.S. Citizenship and Immigration Services document indicates it was filed on March 31, 2000, although Lezama had stated it was filed on March 27, 2000. A different document refers to a "receipt date" of May 16, 2000. The application date is important because NACARA requires an application to have been filed before April 1, 2000. NACARA § 202(a)(1)(A).

however, he applied for relief under NACARA § 202 — a provision excusing both his prior entry without inspection and the pending 1997 order of removal — to adjust his status to that of an alien lawfully admitted for permanent residence.

NACARA is powerful legislation for an alien like Lezama who has no criminal record. Enacted in 1997 in response to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009 (1996) ("IIRIRA"), among other measures, "NACARA § 202 created a new 'adjustment of status' process for qualified nationals of Nicaragua and Cuba." *Masnauskas v. Gonzales*, 432 F.3d 1067, 1070 (9th Cir. 2005).

> NACARA [§ 202] mandated that the Attorney General legalize the status of Nicaraguan and Cuban nationals unlawfully present in the United States if they (1) had been physically present in the United States for a continuous period beginning no later than December 1, 1995 through the date of the application for relief; (2) applied for adjustment of status before April 1, 2000; (3) were otherwise eligible to receive an immigrant visa; and (4) were otherwise admissible to the United States for permanent residence.

*Frech v. U.S. Attorney Gen.*, 491 F.3d 1277, 1279 (11th Cir. 2007).[5] That is, if a NACARA § 202 applicant is eligible, the status of the alien "*shall* be adjusted by the Attorney General to that of an alien lawfully admitted for permanent residence[.]" NACARA § 202(a)(1) (emphasis added). Further, while an application is pending, a NACARA § 202 applicant is entitled to a stay of removal, and a grant of work authorization. *Id.* §§ 202(c)(1) & (2).

---

[5]Congress subsequently repealed the third condition ("otherwise available to receive an immigrant visa"). NACARA — Technical Corrections § 1(a)(2), Pub. L. No. 105-139, 111 Stat. 2644 (Dec. 2, 1997).

Lezama appears to have met the eligibility requirements for § 202(a) relief. Although not entirely clear, his application was apparently filed before April 1, 2000. He was physically present in the United States before December 1, 1995, and such presence continued uninterrupted until the date he applied. *See id.* § 202(b)(1).[6] He appears to have been "otherwise admissible" as he had no criminal history. The legacy Immigration and Naturalization Service ("INS") had completed "preliminary processing" of his application, but Lezama was awaiting an interview in 2004. Meanwhile, Lezama had NACARA work authorization, and the prior removal order was stayed.

On March 25, 2004, Lezama was driving a company truck from Long Beach, California, to a company office in San Diego.[7] He could not locate his destination, and found himself in traffic on the "I-5" freeway going toward the Mexico border near San Ysidro, California. As he neared the border, he was unable to locate an exit and tried to move out of traffic, but a police officer motioned for him to keep going. He drove into Mexico, immediately turned around to come back to the United States, but was turned away. Specifically, Lezama describes the circumstances of his unplanned departure from the United States, in part, as follows:

---

[6]NACARA § 202(b)(1) provides:

The benefits provided by [§ 202(a)] shall apply to any alien who is a national of Nicaragua or Cuba and who has been physically present in the United States for a continuous period, beginning not later than December 1, 1995, and ending not earlier than the date the application for adjustment under such subsection is filed, except an alien shall not be considered to have failed to maintain continuous physical presence by reason of an absence, or absences, from the United States for any periods in the aggregate not exceeding 180 days.

[7]This factual description of the March 25, 2004 incident is taken from Lezama's translated verified declaration, which the government did not dispute and which the IJ accepted as accurate.

> I was not familiar with the area of San Diego, having been there only once before in my life. I arrived in San Diego at about 6:15 a.m. that morning. I was on Interstate Highway 5 south; however, I could not locate the appropriate offramp to the company office. I continued driving south on 5 and before I knew it I was in the area of San Ysidro, California near the United States/Mexican border. As I got close to the border I was looking for a way to turn the truck around in order to head back north. I worked my way out of the traffic toward the side of freeway 5 and slowed down looking for a place to stop; however, there was a police officer in the area who yelled in my direction saying, "Let's go, let's go," while motioning with his hand for me to continue south. I figured that there must be a place further south on the American side of the border where I could make a Uturn [sic] or exit in order to head back north on 5. So I proceeded slowly south on 5 looking for a U-turn or an exit; however, before I knew it I was in the flow of traffic being funneled through the exit to Mexico, unable to stop. The next thing I knew I had unintentionally crossed the United States/Mexican border into Mexico.

When he turned around, Lezama was refused admission at the San Ysidro Port of Entry because he lacked a valid entry document. Desperate, he tried again four days later at the Otay Mesa Port of Entry, with someone else's identification, and was detained.

Lezama was subsequently charged in a Notice to Appear with being an "arriving alien" subject to removal under 8 U.S.C. § 1182(a)(7)(A)(i)(I) because he lacked valid entry documents when applying for admission. Lezama filed a motion to terminate removal proceedings, contending he was not an "arriving alien."[8] He argued that, because he did not

---

[8]An "arriving alien" is defined by regulation in pertinent part as "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1001.1(q).

intend to depart the United States, he was not making an "entry" into the country when he returned. The IJ acknowledged Lezama's inadvertent departure but, given the pending removal order against him, the IJ denied the motion to terminate. The IJ reasoned:

> [i]f the only problem we had here was the fact that Mr. Lezama left the United States inadvertently, that would be something obviously that has to be considered [but] the problem was there was an in absentia deportation order pending at the time that he inadvertently went across the border. And so he self-deported himself.

A different IJ later also concluded that Lezama had abandoned his pending NACARA § 202 application "as of the moment of his departure." The IJ relied on 8 C.F.R. § 245.13(k) — part of NACARA's implementing regulations — which provides in part:

> Unless the applicant files an advance parole request prior to departing from the United States, and the Service approves such request, his or her application for adjustment of status under section 202 of Public Law 105-100 is deemed to be abandoned as of the moment of his or her departure.

The IJ reasoned that "[t]he regulation does not speak in terms of a[n] 'inadvertent' or 'involuntary' departure . . . it simply declares that any alien who departs the United States without advanced parole (as [Lezama] did) abandons his application for NACARA adjustment." The IJ was "unwilling to graft onto the regulation['s] language a 'voluntary departure' proviso." Accordingly, the IJ ordered Lezama removed after finding him inadmissible under § 1182(a)(7)(A)(i)(I).

The BIA affirmed and adopted the IJ's decision in an unpublished, one-judge, per curiam order. As for NACARA, the BIA's reasoning (in full) was as follows:

> We adopt and affirm the decision of the Immigration Judge with the following additions. *See Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994) ([parenthetical omitted]). We agree that [Lezama's] departure from the United States, while his application for adjustment of status was pending, effected the abandonment of his application for adjustment of status pursuant to NACARA. *See* section 245 of the Act, at Note 9; *see also* 8 C.F.R. § 1245.13(k)(1). Thus, [Lezama's] application for adjustment of status, pursuant to the NACARA, was properly denied.

Lezama then filed this timely petition for review. We have jurisdiction pursuant to 8 U.S.C. § 1252(a).

## II.    *STANDARDS OF REVIEW*

### A.    We Review Both the IJ and BIA Decisions

Where the BIA adopts and affirms the IJ's decision by citing *Matter of Burbano*, it is adopting the IJ's decision in its entirety. *See Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). And where the BIA conducts its own review of the evidence and law, the court's "review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation marks omitted).

Here, the BIA cited *Matter of Burbano* and stated that it made "the following additions." It is not clear whether the BIA's "additions" refer to NACARA or only to asylum, but as to NACARA it appears the BIA "provided its own review of the evidence and the law" and so "we review both the IJ and the BIA's decision." *Joseph v. Holder*, 600 F.3d 1235, 1239-40 (9th Cir. 2010).

**B.   We Give "*Skidmore* Deference" to Nonprecedential BIA Decisions Interpreting Statutory Provisions**

"We review *de novo* the BIA's determination of questions of law, except to the extent that deference is owed to its interpretation of the governing statutes and regulations." *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1011 (9th Cir. 2006). "We apply *Chevron* deference to the Board's interpretations of ambiguous immigration statutes, if the Board's decision is a published decision." *Guevara v. Holder*, 649 F.3d. 1086, 1089 (9th Cir. 2011). Where — as here — a BIA decision interpreting a statute is "unpublished and issued by a single member of the BIA[,] it does not carry the force of law, and [ ] is accorded only *Skidmore* [*v. Swift & Co.*, 323 U.S. 134 (1944)] deference proportional to its thoroughness, reasoning, consistency, and ability to persuade." *Mejia-Hernandez v. Holder*, 633 F.3d 818, 822 (9th Cir. 2011) (citing *Garcia-Quintero*, 455 F.3d at 1012-15).

Under *Skidmore*, "we defer to the BIA's determination only to the extent that it has power to persuade." *Saavedra-Figueroa v. Holder*, 625 F.3d 621, 625 (9th Cir. 2010); *see also Edu v. Holder*, 624 F.3d 1137, 1143 (9th Cir. 2010) (reasoning that "[t]he weight accorded to an administrative judgment in a particular case will depend upon [among other factors] the thoroughness evident in its consideration") (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (some editorial marks omitted)).

**C.   We Give "Substantial Deference" to an Agency's Reasonable Interpretations of its Ambiguous Regulations**

In contrast, an agency's interpretation of its regulations is given "substantial deference," which differs slightly from the traditional "*Chevron* deference" given to agency interpretations of statutes. *See, e.g.*, *Lal v. INS*, 255 F.3d 998, 1004 n.3 (9th Cir. 2001) ("Because this case involves the interpretation

by the BIA of its own regulation (and not the language of a statute) we look to the line of cases including *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995), *Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), and not the line of cases involving interpretations by agencies of Congressional legislation, including *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).").

"When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is "reasonable," that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.' " *Lal*, 255 F.3d at 1004 (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991)). The court defers "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). Stated another way, agency interpretations of its ambiguous regulations are "controlling unless plainly erroneous or inconsistent with the regulation" or there is other "reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins*, 519 U.S. 452, 461, 462 (1997) (internal quotation marks and citation omitted). Such agency interpretations can be controlling even if advanced for the first time in a legal brief. *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2260 (2011) (citing *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880-81 (2011)).

## III.   *DISCUSSION*

## A.   Inadmissibility and NACARA

Lezama contends that his departure on March 25, 2004 was "unintentional," "involuntary," or "inadvertent." He did not

plan to leave the United States, had no purpose to enter Mexico, and did not want to or intend to abandon his pending NACARA § 202 application. And indeed the government does not dispute the circumstances of Lezama's departure. Rather, the question is whether his intent makes any difference. The government's position — as the IJ and BIA concluded — is that Lezama's subjective intent is irrelevant.

Lezama raises his "unintentional" state-of-mind argument in two contexts: (1) in challenging the determination that he was an "inadmissible" "arriving alien" and therefore removable, and (2) in challenging the conclusion that he abandoned his pending NACARA § 202 application for adjustment of status. He argues that because he did not "intend" to depart, he did not abandon his application when he drove into Mexico and was not "seeking entry" when he turned around to come back. *See generally Rosenberg v. Fleuti*, 374 U.S. 449, 462 (1963) (reasoning that "innocent, casual, and brief" departures by a resident alien are 'unintended' and do not interrupt residence so as to subject an alien to potential consequences of an 'entry' on return).

Lezama's argument, however, relies on concepts of "entry" and "voluntariness" that were superceded by IIRIRA, effective April 1, 1997. *See, e.g.*, *Camins v. Gonzales*, 500 F.3d 872, 876-79 (9th Cir. 2007) (detailing the history and application of the "*Fleuti* doctrine," and explaining how IIRIRA abolished the doctrine, at least in part). Nevertheless, the concepts are still relevant as some aspects have survived, and are important in understanding the meaning of the current legal structure. Thus, before analyzing the effect, if any, of Lezama's intent under existing law, we briefly review the prior regime.

## 1. IIRIRA Changed the Concept of "Entry" to "Admission"

Prior to passage of IIRIRA, aliens coming to the United States seeking "entry" were subject to "exclusion" proceed-

ings, whereas aliens already present in the United States were subject to "deportation" proceedings. *See Hing Sum v. Holder*, 602 F.3d 1092, 1099-1100 (9th Cir. 2010). Those physically present in the country — including those having entered illegally without inspection — had advantages over those seeking "entry." *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 26 (1982) ("[A] deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding[.]"). "This so called 'entry doctrine' resulted in an anomaly." *Hing Sum*, 602 F.3d at 1100. "[N]on-citizens who had entered without inspection could take advantage of the greater procedural and substantive rights afforded in deportation proceedings, while non-citizens who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." *Id.*

The Immigration and Nationality Act ("INA") had defined "entry" as follows:

> The term "entry" means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws *if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary*[.]

8 U.S.C. § 1101(a)(13) (repealed 1996) (emphasis added). In interpreting whether a departure was "intended" and "voluntary," *Fleuti* held that only "meaningfully interruptive" departures from the United States subject a resident alien to the INA's entry requirements. 374 U.S. at 462. Accordingly, law-

ful resident aliens who made an "innocent, casual, and brief" trip outside the United States — such as what Lezama appears to have made — did not "intend" to "depart," were not seeking "entry" into the United States, and thus were generally not subject to "exclusion" proceedings.

Although § 1101(a)(13)'s exception for unintended, involuntary ("innocent, casual, and brief") departures was limited to aliens "having a lawful permanent residence in the United States," we recognized that the exception could apply in other situations, where Congress so provided. *See Aguilera-Medina v. INS*, 137 F.3d 1401, 1404 (9th Cir. 1998) (holding that "the *Fleuti* doctrine extends to lawful temporary residents in the [Special Agricultural Workers] program on the same terms as to lawful permanent residents"); *Mendoza v. INS*, 16 F.3d 335, 337 (9th Cir. 1994) ("Barring a congressional mandate, such as 8 U.S.C. §§ 1254(b)(2) and 1255a(a)(3)(B), the *Fleuti* doctrine applies only to lawful permanent resident aliens.").

Effective April 1, 1997, however, IIRIRA replaced "entry" with a new concept — "admission." Section 1101(a)(13) now uses the term "admission" to include a "*lawful* entry" as follows:

> (A) The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.
>
> . . . .
>
> (C) An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien —
>
> > (i) has abandoned or relinquished that status,

(ii) has been absent from the United States for a continuous period in excess of 180 days,

(iii) has engaged in illegal activity after having departed the United States,

(iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,

(v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or

(vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

Congress "eliminated the key terms 'entry' and 'intended' from [§ 1101(a)(13)] and replaced the former statute with a comprehensive scheme for determining the classification of returning aliens." *Camins*, 500 F.3d at 879 (quoting *Tineo v. Ashcroft*, 350 F.3d 382, 391 (3d Cir. 2003)). Eliminating "entry" and "intended" — which formed the central basis for the reasoning in *Fleuti* — also effectively "abrogated the *Fleuti* doctrine" (at least in the admissibility context). *Id.* at 878-80 (citing *Matter of Collado-Munoz*, 21 I. & N. Dec. 1061, 1065 (BIA 1998) (en banc)). The new § 1101(a)(13) is "a complete makeover of [§ 1101(a)(13)] . . . specifically intended to supplant the subjective intent inquiry that was a feature of the old law." *Id.* at 879 (quoting *Tineo*, 350 F.3d at

393). IIRIRA also replaced deportation and exclusion proceedings with more general "removal" proceedings. *Hing Sum*, 602 F.3d at 1100. In short, " 'admission' now determines whether a non-citizen is subject to grounds of deportability or inadmissibility within the context of a removal proceeding." *Id.*

Notably, IIRIRA replaced *Fleuti*'s subjective intent standard (for lawful permanent residents) with an objective 180-day period of allowed absence from the United States, regardless of intent. *See* 8 U.S.C. § 1101(a)(13)(C)(ii). "The final version of [§ 1101(a)(13)] . . . pays homage to *Fleuti* by presumptively treating all trips abroad lasting 180 days or fewer as inconsequential to permanent resident status." *Tineo*, 350 F.3d at 394. It "fully recognizes the increase in cross-border travel and the notion that innocent, casual, and brief trips abroad should not interrupt an alien's permanent residency." *Id.* Although generally abrogated, "an aspect of *Fleuti* is preserved." *Id.*

"Congress amended section [1101(a)(13)] of the [INA] simply to eliminate that aspect of the 'entry doctrine' that permitted aliens who had entered without inspection to have greater procedural and substantive rights in deportation proceedings than those who had presented themselves for inspection at a port of entry and had been placed in exclusion proceedings." *In re Quilantan*, 25 I. & N. Dec. 285, 291 (BIA 2010) (citations omitted). This intent is evident in the meaning of the term "*lawful* entry" in § 1101(a)(13)(A) (defining " 'admission' and 'admitted' [to] mean . . . the lawful entry of the alien into the United States"). "Lawful entry" refers to an entry "involving 'inspection and admission by an immigration officer,' as opposed to those 'unlawful' entries involving 'actual and intentional evasion of inspection at the nearest inspection point.' " *Hing Sum*, 602 F.3d at 1101 (quoting *Matter of Pierre*, 14 I. & N. Dec. 467, 468 (1973)).

IIRIRA, then, was directed in part at aliens (like Lezama) who had entered the United States without inspection. After

IIRIRA, if such aliens depart and attempt to reenter, they will be "arriving aliens" and will be "inadmissible."

Here enters the importance of NACARA — for certain aliens, NACARA essentially gave back some of what IIRIRA took away.

### 2. Applicants for Adjustment of Status under NACARA § 202

Congress "enacted NACARA in 1997 to ameliorate some of the harsher effects of IIRIRA for nationals of certain countries [— primarily Nicaragua and Cuba]." *Masnauskas*, 432 F.3d at 1070.

> NACARA . . . was intended to favor aliens who had taken unusual risks in escaping from oppressive governments or whose countries had been ravaged by war. The enactment of NACARA was a rational diplomatic decision to encourage such aliens to remain in the United States. Nicaraguan aliens were a particular concern of Congress because of United States' involvement in the civil war in Nicaragua, the large number of Nicaraguan asylum-seekers in the 1980s, and a history of special programs for Nicaraguan aliens under the Carter and Reagan administrations.

*Id.* at 1071 (citations omitted). As explained by one of its sponsors,

> [NACARA] incorporates an agreement . . . between House and Senate negotiators to correct provisions in last year's immigration law [IIRIRA]. These provisions . . . would have had the effect of changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had

been torn apart by war and oppression and are seeking permanent residency here.

. . . . Nicaraguans who were in the United States prior to January 1, 1995 will be permitted to adjust to permanent residence — and get green cards — if they have maintained a continuous presence here. The same right will be extended to their Nicaraguan spouses and children.

143 Cong. Rec. S12261 (daily ed. Nov. 9, 1997) (statement of Sen. Abraham), *available at* 1997 WL 693186.[9] Senators explained that

The purpose of this Act is to ensure that nationals of certain specified countries . . . are accorded a fair and equitable opportunity to demonstrate that, under the legal standards established by this Act, they should be permitted to remain, and pursue permanent resident status, in the United States.

In recognition of the hardship that those eligible for relief suffered in fleeing their homelands . . . the Congress directs the Department of Justice and the Immigration and Naturalization Service to adjudicate applications for relief under this Act expeditiously and humanely.

143 Cong. Rec. S12266 (daily ed. Nov. 9, 1997) (Explanatory Memorandum Regarding NACARA submitted by Senators Mack, Graham, Abraham, Kennedy, and Durbin), *available at* 1997 WL 693186.

---

[9]The intent is also demonstrated by a parallel provision, NACARA § 203, which reinstated certain changes IIRIRA had made to suspension of deportation qualifications that had an unfairly retroactive effect for some aliens. *See, e.g.*, *Albillo-De Leon v. Gonzales*, 410 F.3d 1090, 1096 (9th Cir. 2005); *Masnauskas*, 432 F.3d at 1070.

**[1]** "NACARA grants similarly situated immigrants from Cuba and Nicaragua the opportunity to become lawful permanent residents *independent of the Attorney General's favorable discretion.*" Eli Coffino, *Long Road to Residency: The Legal History of Salvadoran & Guatemalan Immigration to the United States with a Focus on NACARA*, 14 Cardozo J. Int'l & Comp. L. 177, 178 (2006) (emphasis added). "[Section 202] of NACARA is as close to a free pass for American residence as the INS grants." *Id.* at 192 (citing Patrick E. Caldwell, *NACARA: Minotaur or Midas?*, 53 SMU L. Rev. 1559, 1573 (2000)).

**[2]** With this intent, Congress promulgated NACARA § 202. As summarized earlier, § 202(a) provides that aliens who (1) applied before April 1, 2000, (2) had maintained a "continuous physical presence" in the United States before applying, and (3) were "otherwise admissible," shall have their status adjusted to a lawful permanent resident. Section 202(a) specifically excuses some statutory grounds of inadmissibility, stating that "in determining . . . admissibility the grounds for inadmissibility specified in [8 U.S.C. §§ 1182(a)(4), (5), (6)(A), (7)(A), and (9)(B)] shall not apply." One of these excused grounds is § 1182(a)(6)(A)[10] — including aliens (like Lezama) who had entered without inspection. In effect, then, NACARA § 202 reinstated an aspect of the pre-IIRIRA "entry doctrine" for eligible aliens.

**[3]** NACARA § 202 also partially codified another aspect of the pre-IIRIRA "*Fleuti* doctrine." Just as IIRIRA in 8 U.S.C. § 1101(a)(13)(C)(ii) "pays homage to *Fleuti* by presumptively treating all trips abroad lasting 180 days or fewer as inconsequential to permanent resident status," *Tineo*, 350 F.3d at 394, NACARA § 202 also "pays homage to *Fleuti*" by

---

[10]Section 1182(a)(6)(A)(i) provides:

> An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

allowing an alien up to 180 days outside the country prior to applying, while still having maintained the necessary "continuous physical presence" to qualify to seek relief. In this regard, § 202(b) provides:

Aliens eligible for adjustment of status. —

(1) In general. — The benefits provided by subsection (a) [of this note] shall apply to any alien who is a national of Nicaragua or Cuba and who has been physically present in the United States for a continuous period, beginning not later than December 1, 1995, and ending not earlier than the date the application for adjustment under such subsection is filed, *except an alien shall not be considered to have failed to maintain continuous physical presence by reason of an absence, or absences, from the United States for any periods in the aggregate not exceeding 180 days.*

(Emphasis added.)

**[4]** And, as stated above, NACARA § 202(c) authorizes a stay of any pending removal order:

(1) In general. — The Attorney General shall provide by regulation for an alien subject to a final order of deportation or removal to seek a stay of such order based on the filing of an application under subsection (a) [of this note].

(2) During certain proceedings. — Notwithstanding any provision of the Immigration and Nationality Act [8 U.S.C. § 1101 et seq.], the Attorney General shall not order any alien to be removed from the United States, if the alien is in exclusion, deportation, or removal proceedings under any provision of such Act and has applied for adjustment of status

under subsection (a) [of this note], except where the Attorney General has rendered a final administrative determination to deny the application.

That is, if an application is pending, the Attorney General[11] "shall not order any alien to be removed." NACARA § 202(c)(2).

With these principles established, we now examine whether Lezama abandoned his NACARA § 202 application for adjustment of status when he drove into Mexico.

## B. Abandonment and 8 C.F.R. § 245.13(k)(1)

### 1. The IJ's Reading Is Inconsistent with the Regulation's Plain Language and Context

The IJ concluded that Lezama abandoned his application "as of the moment" he departed the United States without seeking prior permission in the form of advance parole. The applicable regulation, 8 C.F.R. § 245.13(k)(1), provides in full:[12]

(k) Parole authorization for purposes of travel —

(1) Travel from and return to the United States while the application for adjustment of status is pending. *If an applicant for benefits under section 202 of Pub.*

---

[11]NACARA's reference to the "Attorney General" now refers to the Secretary of Homeland Security as well. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1517, 116 Stat. 2135, 2311 (codified at 6 U.S.C. § 557). *See, e.g.*, *Diouf v. Napolitano*, 634 F.3d 1081, 1085 n.5 (9th Cir. 2011) ("[W]e refer to the Attorney General rather than the Secretary of Homeland Security to maintain conformity with the language of the statutes themselves.").

[12]Section 245.13(k)(1) is the Department of Homeland Security regulation; it is identical to 8 C.F.R. § 1245.13(k)(1), which is the provision governing the Executive Office for Immigration Review. *See, e.g.*, *Bona v. Gonzales*, 425 F.3d 663, 665 n.1 (9th Cir. 2005).

> *L. 105-100 desires to travel outside, and return to, the United States* while the application for adjustment of status is pending, he or she must file a request for advance parole authorization on an Application for Travel Document (Form I-131), with fee as set forth in § 103.7(b)(1) of this chapter and in accordance with the instructions on the form. If the alien is either in deportation or removal proceedings, or subject to a final order of deportation or removal, the Form I-131 must be submitted to the Assistant Commissioner for International Affairs; otherwise the Form I-131 must be submitted to the director of the Texas Service Center, who shall have jurisdiction over such applications. *Unless the applicant files an advance parole request prior to departing from the United States, and the Service approves such request, his or her application for adjustment of status under section 202 of Public Law 105-100 is deemed to be abandoned as of the moment of his or her departure.* Parole may only be authorized pursuant to the authority contained in, and the standards prescribed in, section 212(d)(5) of the Act [8 U.S.C. § 1182(d)(5) regarding parole into the United States for humanitarian reasons].

*Id.* (emphases added).

In deeming Lezama's application abandoned, the IJ relied specifically on the emphasized third sentence of the regulation ("Unless the applicant files an advance parole request prior to departing from the United States . . . his or her application . . . is deemed to be abandoned as of the moment of his or her departure."). The BIA's per curiam order simply agreed with the IJ on this point, with no further analysis.

**[5]** This reading, however, ignores the first sentence of the regulation, and as a result fails to read the entire regulation in

context.[13] Section 245.13(k)(1) begins with a clear limitation: "[i]f [a NACARA § 202 applicant] *desires* to travel outside, and return to, the United States . . . ." (Emphasis added). Read in context, the rest of the regulation is likewise limited to and applies only if an applicant fails to obtain advance parole and that applicant had "desired" to travel outside and return to the United States. The regulation requires prior approval if an applicant plans to travel outside the United States — but one cannot gain prior approval for an accident.

**[6]** The regulation as a whole simply does not address the situation where a NACARA § 202 applicant never "desired to" (*i.e.*, never "planned to" or "intended to" or "had a purpose to") travel outside the United States. As a result, the consequence of failing to obtain advance parole (abandonment) does not apply to an "undesired" or inadvertent departure. Effectively, abandonment occurs only for a desired departure absent advance parole.

**[7]** In their decisions, neither the IJ nor the BIA mentions the conditional limiting language. The IJ relied exclusively on the third sentence of the regulation without considering the overriding limitation. But the regulation must be read as a whole. By ignoring the "desired" requirement, the IJ necessarily misinterpreted the meaning of the regulation's third sentence. *Cf. Singh v. Holder*, 649 F.3d 1161, 1167 (9th Cir. 2011) (en banc) (reasoning that the third clause of the statute at issue was "linked by its language and context directly to" the first clause). Thus, the BIA's and IJ's interpretation of § 245.13(k)(1) was "unreasonable" and does not "sensibly

---

[13]*See Dada v. Mukasey*, 554 U.S. 1, 16 (2008) ("In reading a statute we must not look merely to a particular clause, but consider in connection with it the whole statute.") (internal quotation marks omitted); *Kucana v. Holder*, 130 S. Ct. 827, 835 (2010) (reiterating that a term in an immigration statute "must draw its meaning from its context") (quoting *Ardestani v. INS*, 502 U.S. 129, 135 (1991)); *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) ("[W]e construe language in its context and in light of the terms surrounding it."). This rule of interpretation applies equally to regulations.

conform[ ] to the purpose and wording of the regulation[.]" *Lal*, 255 F.3d at 1004. It is unreasonable to deem a NACARA § 202 application abandoned for failing to do something (obtain advance parole) that an applicant could not have done (because the departure was unplanned). Our reading — that abandonment for lack of advance parole does not apply if travel was not desired — is "compelled by the regulation's plain language." *Id.*

Although the BIA may have provided "its own review of the [regulation]," *Joseph*, 600 F.3d at 1239, we give its decision no deference under *Auer*. Its per curiam order was decided under 8 C.F.R. § 1003.1(e) by a single-member. Such a decision is not precedential. *See Garcia-Quintero*, 455 F.3d at 1012-13 ("A case must be decided by a three-member panel if it presents '[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures.' ") (citing 8 C.F.R. § 1003.1(e)(6)(ii)). *Garcia-Quintero* analyzed what deference we give to such a single-member BIA decision interpreting a *statutory* provision, and concluded such decisions are accorded only *Skidmore* deference in proportion to their power to persuade. *Id.* at 1014-15. For a similar reason, the BIA's decision here is entitled to no deference under *Auer* as an agency interpretation of a regulation. The nature of this one-member, non-precedential, BIA order — one that does not explain its reasoning — "does not reflect the agency's fair and considered judgment on the matter in question." 519 U.S. at 462. *See Joseph v. Holder*, 579 F.3d 827, 833-35 (7th Cir. 2009) (applying *Auer*, reasoning in part that an interpretation in a single-member, non-precedential, BIA decision was inconsistent with the plain language of a regulation).[14]

---

[14]The BIA appears to have also considered statutory provisions. It cited to "section 245 of the Act, at Note 9," which could refer to NACARA itself or some other provision of 8 U.S.C. § 1255 regarding abandonment. Further, 8 U.S.C. § 1101(a)(13) regarding "admission" is also at issue. To the extent the BIA here was interpreting statutes, we also do not defer because of the cursory nature of its unpublished, non-precedential, single-

We also owe the government's interpretation no deference under *Chase Bank USA*, 131 S. Ct. at 880-81 (indicating that a court defers to an agency's interpretation of its own regulation, even if only advanced in a legal brief, unless "plainly erroneous or inconsistent with the regulation") (quoting *Auer*, 519 U.S. at 461). The government, like the BIA and IJ below, did not address the limiting language ("desired") in § 245.13(k)(1). And its argument (like the IJ's decision) — that the third sentence in the regulation plainly deems any departure without advance parole to be an abandonment — improperly isolates the sentence untethered from its context. It is therefore "plainly erroneous" and "inconsistent with the regulation." *Auer*, 519 U.S. at 461.

## 2.   *Our Reading Is Consistent With Other Provisions*

Our reading limiting abandonment to "desired" departures is bolstered by, and completely consistent with, other aspects of the statute and its regulations.

When promulgating NACARA's regulations, rule-makers specifically addressed the possibility of travel outside the United States while an application was pending. In so doing, rule-makers did not state that *any* unapproved absence would

member order. *See Garcia-Quintero*, 455 F.3d at 1012. The BIA simply stated that Lezama's departure "effected the abandonment of his application," citing the statute and 8 C.F.R. § 1245.13(k)(1). Indeed, the BIA erroneously noted that Lezama "does not specifically contest the Immigration Judge's denial of his motion to terminate proceedings," when Lezama had in fact argued he was not an "arriving alien." *See Edu*, 624 F.3d at 1143 (reasoning that "[t]he weight accorded to an administrative judgment in a particular case will depend upon [among other factors] the thoroughness evident in its consideration"). That is, we need not defer because the BIA's order has no "power to persuade." *See, e.g.*, *Shin v. Holder*, 607 F.3d 1213, 1219 (9th Cir. 2010) ("Because the BIA's opinion is conclusory and lacks any meaningful analysis, we owe it no [*Skidmore*] deference[.]").

automatically result in abandonment. The interim rules contain the following question-and-answer commentary:

> Can an Applicant Travel Outside the United States While the Application Is Pending?
>
> Nothing in NACARA authorizes the Service to allow an applicant to re-enter the United States without proper documents. If an applicant *plans* to leave the United States to go to any other country, including Canada or Mexico, before a decision is made on his or her NACARA adjustment application, the applicant should contact the Service to request advance authorization for parole. If an applicant leaves the United States without such advance authorization, action on his or her NACARA adjustment application *may* be terminated and the application may be denied. An applicant may also experience difficulty when returning to the United States if he or she does not have such advance authorization. Furthermore, *any absence from the United States without an advance parole authorization issued prior to departure counts toward the 180-day aggregate time period that the applicant is allowed to be outside the United States.*

63 Fed. Reg. 27823 (May 21, 1998) (emphases added), *available at* 1998 WL 253314. The commentary speaks in terms of a "planned" departure and only states that an application "*may* be terminated" — not "will be terminated" — if an applicant does not obtain advanced parole. More importantly, an application survives a non-authorized departure, although the non-authorized time counts towards the 180-day limit: "any absence from the United States without an advance parole authorization issued prior to departure counts toward the 180-day aggregate time period that the applicant is allowed to be outside the United States." If an unauthorized departure was intended to result in an automatic abandonment

of a NACARA application, then such a departure could not count towards the 180-day limit. There is no *per se* abandonment in the regulation.

Moreover, NACARA itself contemplates departures, and allows up to 180 days outside the United States prior to applying without interrupting the "continuous physical presence" in the country necessary to qualify for NACARA relief. *See* NACARA § 202(b)(1). Thus, although there is no basis for resurrecting *Fleuti*'s "innocent, casual, and brief" exception, our reading is nevertheless consistent with Congress' recognition that some departures from the country should have no immigration consequences.

And indeed, § 202(b)(1)'s corresponding regulation (8 C.F.R. § 245.13(a)(2)) does not even limit the statutory 180 days of excused absences to the period *before* applying. Section 245.13(a)(2) states that a national of Nicaragua or Cuba is eligible to apply for adjustment of status under NACARA § 202 if the alien

> has been physically present in the United States for a continuous period beginning not later than December 1, 1995, and ending not earlier [than] the date the application for adjustment is *granted*, excluding . . . [a]ny periods of absence from the United States not exceeding 180 days in the aggregate[.]

(Emphasis added.) Section 245.13(a)(2) thus recognizes that an alien should also not interrupt a "continuous physical presence" in the United States *after* applying, and while the application is pending. It includes within the 180-day statutory period any absences up until the application is actually adjudicated. According to its rule-makers, this regulation clarifies that "all absences between the last pre-December 2, 1995, date on which the applicant commenced physical presence and the date on which the application is *approved* count toward the 180-day maximum." 65 Fed. Reg. 15850 (Mar. 24,

2000) (emphasis added). The regulation thus contemplates departures while an application is pending that do not cause abandonment of the application.

Last, our reading of § 245.13(k)(1) is also consistent with Congress' express intent to "encourage [eligible] aliens to remain in the United States," because of a "special diplomatic concern" for Nicaraguans who arrived before December 1, 1995. *Masnauskas*, 432 F.3d at 1071. Our reading supports NACARA's purpose that "Nicaraguans who were in the United States prior to January 1, 1995 will be permitted to adjust to permanent residence — and get green cards — if they have maintained a continuous presence here." 143 Cong. Rec. at S12261. Our reading helps "to ensure that nationals of [covered countries] are accorded a fair and equitable opportunity to demonstrate that, under the legal standards established by [NACARA], they should be permitted to remain, and pursue permanent resident status, in the United States." 143 Cong. Rec. at S12266.

### 3. Other "Abandonment" Situations Are Distinguishable

The government, however, points to analogous situations in immigration law where pending applications for relief are abandoned upon departure from the United States, regardless of intent. *See Aguilera-Ruiz v. Ashcroft*, 348 F.3d 835, 838 (9th Cir. 2003) (upholding 8 C.F.R. § 1003.4, which deems a departure from the United States of a person subject to deportation proceedings while an appeal challenging that deportation is pending to constitute an automatic withdrawal of the appeal, and rejecting a *Fleuti*-type exception for "brief, casual, and innocent" departures); *Long v. Gonzales*, 420 F.3d 516, 520-21 (5th Cir. 2005) (same). *But see Madrigal v. Holder*, 572 F.3d 239, 244 (6th Cir. 2009) (holding that "forcible removal" does *not* render an appeal automatically withdrawn under 8 C.F.R. § 1003.4).

But these situations are distinguishable — they did not apply a regulation like § 245.13(k)(1), which limits abandonment to travel that is "desired." *See Aguilera-Ruiz*, 348 F.3d at 839 (concluding that "[u]nder 8 C.F.R. § 1003.4, *any* voluntary departure from the United States following entry of an order of deportation will be deemed to withdraw a pending appeal"). *See also* 8 C.F.R. § 1003.2(d) (deeming a pending motion to reopen withdrawn upon "any" departure); *and* 8 C.F.R. § 245.2(a)(4)(ii) ("*The* departure from the United States of an applicant who is under exclusion, deportation, or removal proceedings shall be deemed an abandonment of the [adjustment of status] application[.]") (Emphasis added.)

Rule-makers could have chosen not to use the conditional limiting phrase "if [an applicant] desires to travel" in § 245.13(k)(1). The fact that they did must be given some meaning. *Cf. Kucana*, 130 S. Ct. at 838 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Nken v. Holder*, 556 U.S. ___, ___, 129 S. Ct. 1749, 1759 (2009)); *Rodriguez-Barajas*, 624 F.3d at 681 (vacating BIA decision that found a voluntary departure effected a withdrawal of a pending habeas petition, reasoning in part that "the presence of limiting language" in 8 C.F.R. § 1003.4 stood in contrast to broad language "any departure" in § 1003.2(d)).

### 4. It Is Undisputed That Lezama's Departure Was Not "Desired"

The government contends that the IJ did not decide whether an unintentional departure actually took place. It argues that, if we "somehow read into the regulation that an unintentional or mistaken departure does not constitute abandonment" then we must remand pursuant to *INS v. Ventura*, 537 U.S. 12, 16-17 (2002).

In proceedings before the IJ, however, the government did not dispute Lezama's factual testimony (as set forth in his translated declaration) regarding how he inadvertently drove into Mexico. His testimony establishes that he attempted to avoid crossing the border, but was directed by a police officer to continue south, only to be caught in the flow of traffic and "funneled" into Mexico and to be then excluded when he attempted to reenter. The government accepted those facts before the IJ, and instead argued that Lezama's intent was irrelevant to the abandonment of his NACARA application.

[8] It is well established that "if a party fails to raise an objection to an issue before judgment, he or she waives the right to challenge the issue on appeal." *Slaven v. Am. Trading Transp. Co.*, 146 F.3d 1066, 1069 (9th Cir. 1998). Because the government failed to challenge the factual circumstances of Lezama's departure, remand is not warranted. *See, e.g.*, *Mashiri v. Ashcroft*, 383 F.3d 1112, 1123 n.7 (9th Cir. 2004) (concluding that remand was unnecessary where government failed to submit evidence challenging factual question); *Baballah v. Ashcroft*, 367 F.3d 1067, 1078 n.11 (9th Cir. 2004) (declining to remand where INS failed to present evidence of changed country conditions and did not argue the point before the IJ or the BIA). It is therefore undisputed that Lezama did not "desire" to travel outside the United States. Given our analysis of the plain meaning of the regulation, we hold that Lezama did not abandon his NACARA § 202 application to adjust status.[15] The application remains pending.

---

[15]The dissent questions the "legitimacy" of this holding because it "relies on an argument and analysis that has never been advanced by the Petitioner." Dissent at 20492-93. But Lezama argues — as he did before the IJ and the BIA — that "[he], a § 202 of NACARA beneficiary, cannot be deemed to have abandoned his § 245 Application [to adjust status] pursuant to the terms of 8 C.F.R. § 1245.13(k)(1) since he did not intentionally or voluntarily depart the United States." Pet'r's Opening Br. at 12. He contends he "did not leave the country intentionally or voluntarily; accordingly, pursuant to the reasonable connotation of the word 'departed' and as a 'necessary implication' that his acts must be intentional and volun-

## C. Inconsistency with NACARA — Lezama Cannot Be Removed

**[9]** Having established that Lezama's NACARA § 202 application was not abandoned, it follows that the IJ should not have ordered him removed. NACARA § 202(c)(2) unambiguously provides that

> [n]otwithstanding any provision of the Immigration and Nationality Act, the Attorney General shall not order any alien to be removed from the United States, if the alien is in exclusion, deportation, or removal proceedings under any provision of such Act and has applied for adjustment of status under subsection (a) [of this note], except where the Attor-

---

tary, he cannot be deemed to have left the United States pursuant to 8 C.F.R. § 1245.13(k)(1)[.]" *Id.* at 13. Thus, Lezama surely "specifically and distinctly" raises and argues the issue we address here — the meaning and application of the language of 8 C.F.R. § 245.13(k)(1) as it relates to NACARA § 202. *See Independent Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("we 'review only issues which are argued specifically and distinctly in a party's opening brief.'") (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)); *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1136 (9th Cir. 2004) ("[Petitioner's] brief may not be perfectly written, but it is not difficult to discern the point she is trying to make.").

While Lezama did not argue the importance of the first clause of the regulation, he squarely presented us with examining the whole regulation. That he did not examine the regulation as precisely as we do, or that he did not research the background of the regulation, does not raise any question as to the legitimacy of our holding. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Aleman v. Glickman*, 217 F.3d 1191, 1196 n.3 (9th Cir. 2000) (same). Indeed, "[o]nce the issue is raised, a court has an obligation to determine what the law is which will govern the case at hand." *Eldred v. Ashcroft*, 255 F.3d 849, 853 (D.C. Cir. 2001) (Sentelle, J., dissenting from the denial of rehearing en banc).

ney General has rendered a final administrative determination to deny the application.

And, as noted above, rule-makers recognized that under § 202(c)(2), an applicant who is in removal proceedings may not be ordered removed "unless and until the application for adjustment is denied." 65 Fed. Reg. at 15852. "The alien does not need to file any request, motion, or other form beyond the application for adjustment itself in order to benefit from this automatic provision." *Id.*

**[10]** In short, the Attorney General "shall not order any alien to be removed" until he has decided the application. By ordering Lezama removed under 8 U.S.C. § 1182(a)(7)(A)(i)(I) — and given that his NACARA § 202 application is still pending — the IJ violated NACARA. The IJ's order of removal is therefore "manifestly contrary to" the statute. *Mead*, 533 U.S. at 227 (citing *Chevron*, 467 U.S. at 842-45).

### D. Even If Lezama Was an "Inadmissible" "Arriving Alien," He Was Nevertheless "Eligible to Seek Adjustment of Status" under NACARA

The IJ determined that when Lezama left the United States on March 25, 2004, he had executed his outstanding 1997 removal order — he "self deported" — and was therefore an inadmissible "arriving alien" subject to removal when he attempted to reenter the country. We now address what effect our conclusion that Lezama has not abandoned his NACARA § 202 application has on that determination.

Lezama's exact status presents a "chicken or egg" conundrum. Even if he did not abandon his NACARA application, he did exit the country. That is, the question still remains whether Lezama "self-deported." Ultimately, however, we need not resolve Lezama's exact status (whether an "arriving alien" or not) because even if he was an "arriving alien" and

was "inadmissible," he remains eligible to adjust his status under NACARA.[16]

Admissibility is determined under 8 U.S.C. § 1182. Section 1182(a), defining "classes of aliens ineligible for visas or admission," states that "[e]xcept as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States." But § 1182(a) includes several grounds of inadmissibility that NACARA § 202(a)(1)(B) specifically excuses — including aliens (1) who were "present without admission or parole," *i.e.*, that had previously entered without inspection, as set forth in § 1182(a)(6)(a), or (2) who lacked valid travel documents when "applying for admission," as set forth in § 1182(a)(7)(A)(i).

The opening clause ("except as otherwise provided") is a "savings clause," recognizing that Congress reserved the right to specifically allow admission of otherwise inadmissible aliens. NACARA is such legislation. *See Renteria-Ledesma v. Holder*, 615 F.3d 903, 907-08 (8th Cir. 2010) (citing NACARA as a specific example of where Congress has "otherwise provided" to extend eligibility for adjustment of status to inadmissible aliens, as recognized in *In re Briones*, 24 I. & N. Dec. 355 (BIA 2007)); *Padilla-Caldera v. Holder*, 637 F.3d 1140, 1151 (10th Cir. 2011) (same); *accord Garfias-Rodriguez v. Holder*, 649 F.3d 942, 949 (9th Cir. 2011) (fol-

---

[16]An alien ordinarily affects his or her own removal by departing the country while an order of deportation or removal is pending. *See, e.g.*, *Mansour v. Gonzales*, 470 F.3d 1194, 1198 (6th Cir. 2006) ("It is well settled that when an alien departs the United States while under a final order of deportation, he or she executes that order pursuant to the law.") (citations omitted). "Deportation orders are self-executing orders, not dependent upon judicial enforcement." *Stone v. INS*, 514 U.S. 386, 398 (1995). Here, however, Lezama's pending 1997 removal order had been stayed as provided by NACARA. Given the stay, his 1997 order of removal was at least in some sense not "pending." We need not resolve, however, whether departing under that status changes the ordinary result of "self-removal."

lowing *Briones*, and recognizing that Congress may extend eligibility for adjustment of status to inadmissible aliens if done so unambiguously).

**[11]** That is, even where an alien is deemed to be an "arriving alien" and "inadmissible," the alien may still be eligible to adjust status. *See Bona v. Gonzales*, 425 F.3d 663, 669 (9th Cir. 2005) (invalidating a regulation that rendered an "arriving alien" placed in removal proceedings ineligible for adjustment of status, where Congress had specifically allowed the aliens to adjust status if they met other qualifications); *Succar v. Ashcroft*, 394 F.3d 8, 26-29 (1st Cir. 2005) (same). That an alien has departed is not necessarily fatal to the consideration of a pending application to adjust status. *See Marin-Rodriguez v. Holder*, 612 F.3d 591, 593-94 (7th Cir. 2010) (holding that an alien's departure, which constituted a "withdrawal" of a motion, does not deprive the BIA of jurisdiction to reconsider that decision — reconsideration "does not depend on an alien's presence in the country"); *Coyt v. Holder*, 593 F.3d 902, 906 (9th Cir. 2010) (holding the same, reasoning that "in passing IIRIRA, Congress anticipated that petitioners would be able to pursue relief after departing from the United States."). Indeed, the Supreme Court has stated that "[a]liens who are removed may continue to pursue their petitions for review, and those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Nken*, 129 S. Ct. at 1761.

**[12]** Accordingly, even assuming Lezama was an "arriving alien" who was "inadmissible" under either 8 U.S.C. § 1182(a)(6)(A) or § 1182(a)(7)(A)(i), he remains eligible to apply for adjustment of status under NACARA § 202.

## IV. *CONCLUSION*

This case is a prime example that "[t]he maze of immigration statutes and amendments is notoriously complicated and

has been described as 'second only to the Internal Revenue Code in complexity.' " *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (citation omitted). "Nonetheless, we assume that Congress is familiar with the intricacies of the overlapping laws and that it meant what it said," *id.*, when it promulgated NACARA.

**[13]** Because Lezama's departure was not "desired," his NACARA § 202 application was not abandoned under § 245.13(k)(1). His application remains pending. Under NACARA § 202(c)(2), while his application remains pending, he is not removable. And even if his departure rendered him an "arriving alien," he remains eligible for adjustment of status. Accordingly, we grant the petition and remand to allow the government to rule on the pending application to adjust status under NACARA § 202.

Petition GRANTED.

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion for the following four reasons, which I discuss in greater detail below:

1. The majority opinion relies on an argument and analysis that has never been advanced by the Petitioner.

2. The majority opinion gives absolutely no deference to the agency's interpretation of its regulation.

3. The majority opinion relies on prefatory language in the regulation and ignores the substance of the regulation.

4. The majority opinion usurps the agency's authority by granting the petition without giving the agency the opportunity to apply the majority's novel interpretation of the regulation.

Our precedent has consistently reinforced the premise that we do not address issues that are not raised in a petitioner's opening brief. *See Fence Creek Cattle Co. v. USFS*, 602 F.3d 1125, 1134 n.6 (9th Cir. 2010); *see also ONDA v. Locke*, 572 F.3d 610, 614 n.3 (9th Cir. 2009). In his brief to this court, the petitioner argued in two and one-half pages that he "did not leave the country intentionally or voluntarily." Petitioner's Opening Brief, pp. 11-13. He essentially sought to equate the circumstances of his departure to a forced departure. *See id.* Never once did the petitioner cite to the prefatory language of the regulation that has been seized upon by the majority to make an argument that the petitioner never made. *See id.* The majority's stark departure from our precedent seriously calls into question the legitimacy of the majority's holding.

The majority's departure from our precedent is compounded by the fact that the opinion gives absolutely no deference to the agency's interpretation of its regulation. The majority opinion dutifully acknowledges our obligation to defer to the agency's interpretation of its regulation, including those interpretations articulated in litigation briefs. *See Majority Opinion*, p. 20468. The majority opinion even concedes that deference is required "unless an alternative reading is *compelled*." *Id.* at p. 20468 (citation omitted) (emphasis added). Yet, the majority opinion says one thing and does another.

As the majority opinion details, the Immigration Judge (IJ) relied upon the language of 8 C.F.R. § 245.13(k)(1), which provides in pertinent part that "[u]nless the applicant files an advance parole request prior to departing from the United States, and the Service approves such request, his or her application for adjustment of status . . . is deemed to be abandoned

as of the moment of his or her departure . . . ." The majority opinion also recognizes that the Board of Immigration Appeals adopted the IJ's reliance on the regulation. *See Majority Opinion*, p. 20479. This same analysis is reflected in the brief filed on behalf of the agency. *See* Brief for Respondent, pp. 24-30.

The IJ, BIA and Department of Justice all relied on the seismic shift reflected in Congress's enactment of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Prior to the enactment of IIRIRA, continued eligibility for adjustment of status often depended on whether the alien intentionally departed the United States. *See* 8 U.S.C. § 1101(a)(13) (repealed 1996) (excluding from the definition of "entry" a return to the United States if the prior departure "was not intended" or "voluntary"). This statutory provision spawned a litany of cases addressing whether a particular departure was "intended" or "voluntary." *See, e.g., Rosenberg v. Fleuti*, 374 U.S. 449, 452-53 (1963) (describing the judicial evolution of the definition of "entry"). However, following the enactment of IIRIRA and the repeal of § 1101(a)(13), intent of the departing alien became irrelevant. *See, e.g., Camins v. Gonazles*, 500 F.3d 872, 878-79 (9th Cir. 2007) (recognizing that the changes in IIRIRA "were consistent with a complete makeover of § [1101] (13) specifically intended to supplant the subjective intent inquiry that was a feature of the old law . . . .") (*quoting Tineo v. Ashcroft*, 350 F.3d 382, 392-93 (3d Cir. 2003).

In *Camins*, we also deferred to an en banc decision of the BIA that specifically interpreted IIRIRA as abrogating the intent inquiry that was central to the pre-IIRIRA determination of entry. *See id*. at 879-80 (deferring to the BIA's interpretation of IIRIRA as explicated in *Matter of Collado-Munoz*, 21 I&N Dec. 1061, 1064-65 (BIA 1998) (en banc)).

The majority completely ignores the prior deference we have given to the BIA's holding that the intent of the depart-

ing alien is not relevant post-IIRIRA. Instead, the majority opinion seizes upon prefatory language in IIRIRA that has never been interpreted by the BIA in conjunction with a petitioner's admissibility. *See Majority Opinion*, pp. 20480-81 (emphasizing the first sentence of § 245.13(k)(1) and focusing on whether the petitioner "desired" to depart the United States). The majority's focus returns to the "intent" analysis that was eliminated by IIRIRA, although purporting to base its analysis on the "context" of the statutory scheme. *See Majority Opinion*, p. 20480. However, the statutory context points in the other direction. *See Camins*, 500 F.3d at 878-79 (explaining that the purpose of IIRIRA was to eliminate any examination of the subjective intent of the departing alien).

The first sentence of § 245.13(k)(1) provides: "If an applicant for benefits under section 202 of Pub. L. 105-100 desires to travel outside, and return to, the United States while the application for adjustment of status is pending, he or she must file a request for advance parole authorization . . ." Grammatically, it is apparent that the "desires to travel" clause is merely an introduction to the substantive portion of the regulation— the requirement of obtaining advance parole prior to departing the country. Indeed, although the parole requirement is explained in greater detail in the balance of the subsection, no further mention is made of the "desires to travel" language, reinforcing its introductory function. In addition, we have cautioned against reliance on introductory language when engaging in statutory interpretation. *See United States v. Ertsgaard*, 222 F.3d 615, 617-18 (9th Cir. 2000). Our sister circuits agree. *See United States v. Studfin*, 240 F.3d 415, 421 n.5 (4th Cir. 2001); *see also Davric Maine Corp. v. USPS*, 238 F.3d 58, 62 (1st Cir. 2001) (eschewing reliance on introductory language when the balance of the provision "makes clear that this reading is not tenable . . . ."). The majority opinion's inappropriate reliance on introductory language to the exclusion of the substantive provisions, lack of deference to agency interpretation and conflict with IIRIRA's deliberate removal of the intent requirements prevent my joinder.

Finally, even if the majority opinion's holding were correct, it is nevertheless inappropriate to apply this novel interpretation of the regulation without first giving the BIA the opportunity to consider this case in view of the new interpretation of the regulation. *See Pannu v. Holder*, 639 F.3d 1225, 1228 (9th Cir. 2011) (remanding for the BIA to apply intervening legal interpretations).

Because the majority departs from our precedent, misinterprets the governing regulation, gives no deference to the agency, and refuses to remand, I respectfully dissent.